KING *v.* BATTLE CREEK BOX CO.

1. EASEMENTS—WAY OF NECESSITY.
   In a suit to enjoin interference with a loading platform located on defendant's land, which had been used for about 20 years for loading and unloading cars on a side track in connection with plaintiff's building, its claim of a "way of necessity" over said platform is not tenable, where it was clearly shown by the proofs that plaintiff had access to said side track without crossing the platform.[1]

2. SAME—WAY OF NECESSITY BASED ON NECESSITY AND NOT CONVENIENCE.
   No implication of a grant of a right of way can arise from proof that the land granted cannot be conveniently occupied without, since its foundation rests in necessity and not in convenience.[2]

3. SAME—PRESCRIPTION MAY NOT BE BASED ON PERMISSIVE USE.
   Where plaintiff used a loading platform located on defendant's land under friendly and passive permission, and defendant used plaintiff's private driveway under the same conditions, neither asserting hostile or legal right to possession, neither party's claim of easement by prescription is tenable.[3]

4. ADVERSE POSSESSION—PERMISSIVE USER.
   Peaceable occupation or use by acquiescence or permission of the owner cannot ripen into title by adverse possession, no matter how long maintained, since hostility is of the very essence of adverse possession.[4]

5. EASEMENTS—USE OF UNINCLOSED LAND NOT IN ITSELF HOSTILE TO OWNER—PRESUMPTIONS.
   The use for a way of passage of uninclosed vacant land not in use by the owner, or even mere possession of it, is not in itself hostile to the owner; the presumption being

[1]Easements, 19 C. J. § 115; [2]Id., 19 C. J. §§ 111, 115; [3]Id., 19 C. J. § 74; [4]Adverse Possession, 2 C. J. §§ 206, 226.

that such occupancy was in subordination to the legal title.[5]

6. SAME—ALL ESSENTIAL ELEMENTS OF ADVERSE POSSESSION MUST BE SHOWN TO OBTAIN TITLE BY PRESCRIPTION.

To obtain title by prescription all the essential elements of adverse possession for the whole statutory period must be so clearly shown as to make plain to the owner that his rights are being invaded in a hostile manner.[6]

Appeal from Calhoun; North (Walter H.), J. Submitted June 4, 1925. (Docket No. 38.) Decided June 7, 1926. Rehearing denied October 4, 1926.

Bill by Horace C. King against the Battle Creek Box Company to enjoin the removal of a loading platform. Defendant filed a cross-bill asking affirmative relief. From a decree for plaintiff, defendant appeals. Reversed in part and decree entered for defendant.

*Verner W. Main* (*Bernard J. Onen,* of counsel), for plaintiff.

*James Cleary* and *Burritt Hamilton,* for defendant.

STEERE, J.    The parties to this suit own adjoining land in the city of Battle Creek, Michigan, deriving their titles through mesne conveyances from a common grantor. Prior to March 6, 1902, the Consumer's Ice & Coal Company, Limited, owned some property described as lots 97-98-99-100 of Coleman's addition "supplementary to range of blocks number eight (8) of the city of Battle Creek, according to the recorded plat thereof." This property, as appears from the plat thereof in evidence, is bounded on the north by a street named Short, on the east by Division street, S., an indicated, unnamed alley on the west. No south boundary is delineated on the plat, but witnesses testify to a mill pond on the south.

On March 6, 1902, the Consumer's Ice & Coal Com-

[5]Easements, 19 C. J. §§ 82, 181; [6]Id., 19 C. J. §§ 32, 34.

pany sold the north 75 feet of these 4 lots, which fronted on Short street, to the Battle Creek Machine & Foundry Company, the description in grantee's deed of the property conveyed, and rights in connection therewith to which this litigation harks back, being as follows:

"Seventy-five (75) feet off the northerly end of lots ninety-seven (97), ninety-eight (98), ninety-nine (99) and one hundred (100) of Coleman's addition, supplementary to range of blocks number eight (8) of the city of Battle Creek, according to the recorded plat thereof; also a right of way over a strip of land lying between the southerly boundary line of that portion of lots numbered ninety-seven (97), ninety-eight (98), ninety-nine (99) and one hundred (100) of said addition herein conveyed, and the northerly side of the building erected by the Consumer's Ice & Coal Company, Ltd., on the southerly portion of the four lots last mentioned, said strip of land running from the westerly boundary line of said lot numbered ninety-seven (97) to the easterly line of said lot one hundred (100) and being in width five (5) feet more or less, * * * and also the right to the use of a certain side track to be hereafter constructed by the Cincinnati & Northern Railway Company (formerly so-called) now operated by the Michigan Central Railroad Company, said side track running from the easterly side of lot number one hundred (100) of said addition along the edge of the mill pond on the southerly side of said lot number one hundred (100) and lot ninety-nine (99) of said addition, and thence on a curve in a southwesterly direction along the edge of said mill pond to a point where said side track connects with the main line of said Cincinnati & Northern Railway, which said side track said first party agrees to have said railroad construct and complete for use within a reasonable length of time from the date hereof without expense to said second party."

Shortly after purchasing this property the grantee constructed a substantial brick building extending lengthwise along the south side of Short street for

apparently some 200 feet with a width of about 60 feet, the east end being on the west line of Division street.   This left a vacant strip of 12 feet or more between the building and the south line of the property, which, with the five-foot wide right of way granted south of its line, was used as a driveway or private alley between the adjoining owners.   The Ice & Coal Company's building near the south side of the property it had sold was then served by a spur track, and an additional side track provided for in the deed to serve the north 75 feet sold was timely built satisfactory to the grantee and as planned by its agent. Not long after purchasing this site for its plant the Battle Creek Machine & Foundry Company changed its name to the Johnson Foundry & Machine Works, Ltd., and by proper proceedings made of record that property stood in the latter's name.   On January 10, 1903, the Johnson Foundry & Machine Works, Ltd., mortgaged this property to the Jackson State Savings Bank and the mortgage was duly recorded.   In this mortgage the property was described as in the deed from the Ice & Coal Company, including right of way over the five-foot strip lying south of plaintiff's line, but the provision granting side track rights was abbreviated to read as follows:

"and also the right to the use of a certain side track running from the easterly side of lot number one hundred (100) of said addition along the edge of the mill pond on the southerly side of said lot number 100 and lot 99 of said addition, and thence on a curve in a southwesterly direction along the edge of said mill pond to a point where said side track connects with the main line of the Cincinnati & Northern Railway (formerly so-called) now the Detroit, Toledo & Milwaukee Railway."

This mortgage ran for three years and was not paid by the mortgagor when due or later.   It was finally foreclosed, in 1913, and the property bid in by the

Jackson State Savings Bank. Its deed from the commissioner who made the sale on foreclosure is dated June 4, 1913, and contains the same description of the property as the mortgage, including side track rights. On June 25, 1917, the Jackson State Savings Bank conveyed the property to plaintiff by warranty deed, following the description in its mortgage and commissioner's deed, which included the side track rights as above quoted.

Defendant's chain of title from their common grantor begins with a deed of the remaining southern part of the four lots lying between plaintiff's south line and the mill pond given in 1907 to one Sumner O. Bush. It contains a provision that the title is conveyed:

"subject, nevertheless, and reserving to the owners of the land adjoining the premises herein conveyed the right to have and to use and operate said side track, as the same is now located, along the shore of the mill pond, across and upon and over the premises herein conveyed."

So far as shown this provision follows through defendant's chain of title to its immediate grantors, Charles A. Cummings and wife, who, on January 13, 1913, conveyed the property to defendant with the last quoted provision in their deed.

For 10 years following June 6, 1902, the premises now owned by plaintiff were occupied and used for various kinds of manufacturing by tenants or owners. The Johnson Foundry & Machine Works was there until November, 1906, when it sold the property, subject to the mortgage on it, to the Anderson Foundry & Machine Company, which, in May, 1907, deeded it to the Kneeland Manufacturing Company which occupied it for some years, but eventually failed and went out of business. Other manufacturing concerns were in there for longer or shorter terms as tenants. Plaintiff testified he leased the property in 1912 and bought

it in 1913 from the Jackson State Savings Bank.     His muniment of title in evidence here is a deed to him from the bank dated June 25, 1917.     His business is that of a seed dealer, which he has conducted on his property since taking possession of it.

Defendant's business is manufacturing wooden boxes on its premises south of plaintiff's.     It was organized in 1906 and has conducted the business there since becoming owner of that site, and apparently before. The first deed from the common grantor in its chain of title was given in 1907 to one Sumner O. Bush. It contains the following provision:

"Subject, nevertheless, and reserving to the owners of the land adjoining the premises herein conveyed, the right to have and to use and operate said side track as the same is now located along the shore of the mill pond across and upon and over the premises herein conveyed."

The last deed, given by Charles A. Cummings and wife to defendant, and dated January 13, 1913, contains a like provision.

The single side track serves both industries.     It extends northeasterly into Division street near the southeast corner of plaintiff's building diagonally crossing a portion of his driveway before reaching the street. It runs south of defendant's building which lies along the south side of the driveway and partially opposite plaintiff's long brick building, but its west end is at the north and south alley west of the property, leaving to its east a vacant, uninclosed triangular tract of considerable size with the most acute angle at Division street.

Plaintiff has a large door on the south side of his building, opening on the driveway, about 48 feet from the east end of the building.     From this door to the nearest point on the side track is about 40 feet.     There is also another door on that side of the

building nearer Division street which is seldom used. When he acquired his property there was a loading platform which began across the driveway opposite the large door and extended directly across defendant's property south to the side track. By bridging across the driveway with plank supported to the proper level, convenient loading and unloading facilities were afforded between that door and a car spotted on the siding at the south end of the loading platform. The testimony disclosed that this, or a similar, platform had been there used for loading purposes by the occupants of plaintiff's building as they had occasion, since shortly after the building was constructed over 20 years before, without any protest or objection on the part of defendant or its predecessors.

When plaintiff acquired his property he found the loading platform there and used it as he had occasion. In the meantime defendant used plaintiff's private driveway in connection with its property as it had occasion, neither asking permission of or making any objection to the other until shortly before this suit was begun. Of their previous relations plaintiff testified:

"There was never any trouble between these companies up to the time of the instance leading up to this suit. The relations were absolutely friendly."

The instance leading up to this suit began in the fall of 1923 when defendant started to enlarge its building and notified plaintiff that the workmen were getting near to the place where the platform stood and required its removal. This plaintiff refused to do or permit, claiming the legal right to maintain and use it in its then location across defendant's land. Their relations thereafter rapidly became absolutely unfriendly. Defendant removed the platform and plaintiff promptly restored it, forbid defendant the use of his private driveway, brought this suit and obtained

a temporary injunction restraining the removal of the rebuilt platform.

His bill asked permanent injunction restraining interference with his maintenance and use of the platform, damages for its removal, determination of the parties' rights as to use of switch and location for which cars for plaintiff's use could be placed.

Defendant answered in denial, with cross-bill also asking determination of the rights of the parties as to the use of the switch, etc., and an injunction restraining plaintiff from obstructing the driveway between their buildings.

The trial court awarded plaintiff the "permanent right to the use of said loading platform as it now exists," determined that except for moving cars incident to switching the primary right to use that certain side track in loading and other particulars detailed "is in the plaintiff, Horace C. King, his heirs, legal representatives and assigns," awarded plaintiff $112.80 damages and dismissed defendant's cross-bill, with costs to plaintiff.

The theory on which the court sustained plaintiff's claim of permanent right to maintain and use the platform "as it now exists" over defendant's land, is apparently based on the findings and conclusions that the extended siding was located by the original conveyance in plaintiff's chain of title "along the edge of the mill pond" where it could not be reached from the property it was intended to serve without crossing the grantor's then unsold land between, and that, as the court said, the—

"right to cross this land was indispensable to 'the use' of the siding, and became appurtenant under the very terms of the deed (as well as the acts of the parties) to the property conveyed to the original grantee, and it has always continued to be used as such."

We are impressed that the court was under a mis-

apprehension of certain material facts in arriving at such conclusion. When the grant for use of side track "to be hereafter constructed" was given, neither that side track, nor the platform, nor the building on plaintiff's property, was in existence. The building to be served by the side track was constructed after the grant and the platform after the building. It was not impossible to reach and use the side track from the premises conveyed without crossing defendant's land. The side track in its northeasterly course runs diagonally into plaintiff's east and west driveway before it reaches Division street and continues on that course 56½ feet into the street, which, south of Short street, is made a dead end by the mill pond, unused for general travel. Plaintiff testified: "That stub of Division street south of Short street isn't used at all, only serves our building, that is all." He also stated in discussing their increasing necessities, "There are two places where we unload cars;" one of them evidently being at the point "the side track cuts this space (the driveway) on the south side," where he testified they had maintained, for 11 years, chutes and pipes for unloading their bins when they had a car there for that purpose. It was also shown that heavy material had been loaded and unloaded at the southeast corner of plaintiff's building by a crane erected over cars which they ran up past the corner of the building into Division street which, he said "only serves our building" and otherwise "isn't used at all" south of Short street. His witness Johnson said: "The rails in Division street since 1902 were just as it is now, except the extension put in last year, about 10 feet."

Johnson's testimony throws some light on the situation and intent of the parties in connection with the right to use a side track to be thereafter constructed. In the spring of 1902 he became manager of the Battle Creek Machine & Foundry Company, and shortly there-

after the Johnson Foundry & Machine Company, continuing as its business manager until 1905. The brick building was constructed under his supervision. He testified to being in general charge and the whole "future lay-out" of the side track was made by him. Asked "What do you mean by 'future lay-out,' " he replied:

"It was to extend the track farther east, increase the curve up 'to a parallel with the Grand Trunk, putting in a switch at the northeast corner of the track, making the track just long enough to have one car and engine, then putting one track between the coal building (defendant's) and the brick building. * * * *

"*Q.* Why was that plan never carried out?

"*A.* I don't know. * * * This program of getting this track was entirely our program at that time and I thought the user over there would work in co-operation with us. We would co-operate with the other fellow to use the track if they wanted to. The track itself was put exclusively upon the property for the brick building.

"*Q.* And how about the platform?

"*A.* The platform was set at that time. The future program was to extend the track as I say lengthways running on the south side of the full length of the building, and doors had been built for that purpose, and up to that time we had used the platform just as it is in the picture there. * * *

"*Q.* Now what was the purpose * * * of leaving a space 12 or 14 feet on the south side of the brick building?

"*A.* For a track, for a loading track."

We think that access by plaintiff to the siding without crossing defendant's land is clearly shown and the claim that the way over the platform is "a way of necessity" is not tenable. Without the planned side track along the driveway it may be more convenient, but—

"No implication of a grant of a right-of-way can arise from proof that the land granted cannot be con-

veniently occupied without it. Its foundation rests in necessity not in convenience." 14 Cyc. p. 1173.

The undisputed testimony of both sides shows that from the time the common grantor sold plaintiff's property to the original grantee in his chain of title the owners and occupants of these adjoining properties were in friendly relations, conducting their respective activities in the neighborly comity such relations give rise to, until this friction arose. This 12 or 14 feet left vacant just south of plaintiff's brick building for a side track, or driveway, is subject to no rights of defendant. It owns the five-foot strip south of the line, but subject to the right of way granted the owner north of the line and neither party has any right to obstruct it. Plaintiff owns and controls that driveway.

Neither party's claim of easement by prescription is tenable. The use each made of a way over the other's uninclosed property was, under the relations between them, friendly and by passive permission. No assertion of legal right nor hostile invasion or possession is shown. All evidence is to the contrary. We have searched this record in vain for any asserted claim of legal right or hostile demonstration by plaintiff's predecessors in title, to whose adverse use or possession he seeks to tack his claim of easement by prescription to reach the period provided by the statute of limitations. He testified that his use of defendant's land over the loading platform was peaceable as was also defendant's use of his driveway, until this trouble. He said he had claimed property rights there since 1912, but when asked to whom he told he had such rights he replied, "Don't think I ever told any one."

No right or use of way over defendant's vacant land to reach the siding is described or mentioned in his chain of title. Only a right of use was given of a

"certain side track to be hereafter constructed," and which was constructed to his property as agreed, where and as his predecessor had laid it out.

Peaceable occupation or use by acquiescence or permission of the owner cannot ripen into title by adverse possession, no matter how long maintained.   Hostility is of the very essence of adverse possession.   1 R. C. L. pp. 701-705.

"All of the authorities agree that the adverse possession  must have been for the whole period prescribed by the statute, actual, open, visible, notorious, continuous and hostile."   *Bean* v. *Bean*, 163 Mich. 379, 396.

The use for a way of passage of uninclosed vacant land not in use by the owner, or even mere possession of it, is not in itself hostile to the owner.   The presumption would be that such occupancy was in subordination to the legal title.   To obtain title by prescription all the essential elements of adverse possession for the whole statutory period must be so clearly shown as to make plain to the owner that his rights are being invaded in a hostile manner.   *Menter* v. *First Baptist Church*, 159 Mich. 21.   We are of opinion plaintiff has failed to establish his right to perpetual easement for a loading platform across defendant's land.

In their brief defendant's counsel only challenge that portion of the decree sustaining plaintiff's claimed right to maintain and use such platform, the award of damages for its removal by defendant, the injunction and costs.   In those particulars the decree must be reversed, and a new one may be entered here so modifying the decree appealed from, with costs to defendant.

BIRD, C. J., and SHARPE, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.

Justice MOORE took no part in this decision.