*944 OPINION.
Blacb: :
Petitioner makes the following contentions as to why all the profits arising from the sale of the assets of the Michigan Iron & Land Company to the Michigan Iron, Land & Lumber Com *945 pany, a subsidiary of the Ford Motor Company, and the liquidation of the proceeds of such sale, should not be held taxable to him:
(1) The status and interests of the syndicate members were definitely fixed by agreement and the petitioner had no control over payments or distributions during the periods in question.
(2) The trust instrument did not change the relative interests of the syndicate members or give the petitioner the right to more than his residual share.
(3) The petitioner’s residual share could not be increased by refusal to pay contractual expenses of the syndicate.
(4) Payments made to the petitioner during the period in question were not profit and payments of income tax based thereon constitute overpayments of tax.
(5) No profit accrued to members of joint venture until after sale of corporate assets, October 25, 1920.
Respondent's contentions are shown in the quotations from the deficiency notice which we have embodied in our findings of fact.
A great amount of testimony has been taken in this case and the record is a large one, but in its final analysis it resolves itself into the question whether the petitioner was the sole owner of the stock of the Michigan Iron & Land Company, successor to Michigan Iron & Land Company, Ltd., a limited partnership, and entitled to all the profit from the sale and liquidation of the proceeds of its assets, or was merely a member of a group, syndicate, or joint venture and only entitled bo his residual share of the profits, after certain agreed amounts had been paid to others. Considerable argument is devoted by counsel on both sides as to the nature of a joint venture and as to whether one existed in this case, it being contended by petitioner that there was one, while respondent claims that the entire deal belonged to petitioner and that the profits are taxable to him alone.
A joint venture is defined as: “An association of two or more persons to carry out a single business enterprise for profit.” Fletcher v. Fletcher, 206 Mich. 153; 172 N. W. 440; Alderton v. Williams, 139 Mich. 296; 102 N. W. 753.
“While under the present state of the law courts do not treat a joint venture in all respects identical with a partnership, the contractual relations of the parties and the nature of their association are so similar and closely akin to a partnership that it is commonly held that their rights and liabilities are to be tested by the same rules that govern partnerships.” Keismetter v. Rubenstein, 235 Mich. 35; 209 N. W. 154, at page 157.
“ The requisites of a partnership are that the parties must have joined together to carry on a trade or adventure for their common benefit, each contributing property or services and having a community of interest in the profits.” Word v. Thompson, 22 How. 330, 334; 16 L. Ed. 249; Meehan v. Valentine, 145 U. S. 611; 12 Sup. Ct. 972; 36 L. Ed. 835; Keismetter v. Rubenstein, supra, at page 157.
*946 Upon the facts fully detailed in our findings of fact herein, we are of the opinion that originally Charles Will Wright, George A. Osborn, Roberts P. Hudson, and Chase S. Osborn, petitioner, agreed to constitute a joint venture to acquire the stock of the Michigan Iron & Land Company, Ltd., for the purpose of reselling said stock or the assets of said limited partnership and liquidating the proceeds and sharing the profits arising therefrom equally. Subsequently, Lillian J. Osborn, Mary F. Hadrich, Emily O. Sanderson, Ethel O. Ferguson, and Chase S. Osborn, Jr., were taken in as members of the joint venture and a new agreement was made concerning the sharing of profits from it. This agreement was made in 1919 while negotiations were still under way to acquire the stock of the limited partnership, and before any of such stock had been acquired. It was made prior to the entering into of any contracts or options for the sale of the stock or assets of the limited partnership by which the profits herein sought to be taxed were gained. The sharing of the profits thus agreed upon in this verbal understanding entered into in 1919 was the same as set out in the so-called declaration of trust, drawn up by Roberts P. Hudson in 1920 and signed by petitioner, Chase S. Osborn, May 15, 1920. These members of the group which we have enumerated above joined together to carry on a single venture for their common benefit, each contributing property to be used to defray expenses or services and having a community of interest in the profits. We hold that none of the profits arising from the transaction which were paid during the taxable year by the trustee to Charles Will Wright, George A. Osborn, Roberts P. Hudson, Lillian J. Osborn, Mary F. Hadrich, Emily O. Sanderson, Ethel O. Ferguson, and Chase Osborn, Jr., should be taxed to petitioner, Chase S. Osborn. It was not his income. M. J. Sullivan, 2 B. T. A. 1012; Robert Jemison, 3 B. T. A. 780.
We do not think the evidence is sufficient to establish that Adelia Jones Carney, Marie I. Jones, Emma Jones Hogan, Georgiana Brown, Charles R. Osborn, Stephen P. Osborn, Eugene B. Osborn, and Emma O. Reed, were members of the joint venture. They contributed no capital and performed no services to accomplish the success of the joint venture. It is true there is some evidence in the record to the effect that they were to hold themselves in readiness to render service if called upon, but were not immediately designated any specific duties and never performed any. The evidence falls short of meeting the test of joint venturers, as defined by the courts and in prior decisions of this Board.
It is clear that they acquired their interests in the profits not through any efforts or capital which they contributed to the joint enterprise, but through the generosity of petitioner, Chase S. Osborn. The following questions and answers on this point at the hearing, are explanatory of the true situation, as we see it:
*947 Q. Now as a matter of fact is this not the situation — we want to get the facts here — that you felt an obligation to take these people in, although they were not there really as partners in this enterprise, and to pay them such profit as might have accrued to the extent you have stated?
A. Not at all. It has been the policy of my life from the first penny I have earned to consider them as my partners and to give them a chance to do and help in order that they might not consider themselves mendicants, or to humiliate them, they were made a part of my life in many deals before this. This is maybe the twentieth or thirtieth; in other words, I have been the one who, perhaps, was gifted to make money, and they have done much work to help me in all the things I have achieved.
Q. You mean they gave you a moral stimulus?
A. No, an actual physical assistance.
Q. What physical assistance did Eugene Osborn give you?
A. He was twelve years older than I am, and he took care of me as a boy.
Q. I mean in regard to this particular deal?
A. If he had not taken care of me I would have been dead and could not have made this deal.
Q. That is rather in the nature — in the nature of a moral obligation?
A. No, that is the most serious obligation you have on earth. That makes him more serious as a partner.
Q. I realize you are getting down to fundamentals?
A. I do not blame the court or you for thinking it is an odd situation. It is odd, but I have always done this. I have always counted in everybody that ever contributed the weight of a hair to me. They have gotten into my heart to participate in any respect. They have been my partners of life.
The foregoing testimony mirrors a most praiseworthy attitude on the part of petitioner and doubtless we would have a much happier world in which to live if his generosity were more widely emulated, but in testing whether one is a member of a joint venture and entitled in his own right to part of the profits, we have to look to the usual tests of the law, and when we look to these tests, we are unable to hold that the eight persons whom we have named above were members of the joint enterprise. They received their interests as a gift and were not participants in their own right. Were these gifts completed and irrevocable before there was any accrual of profits in the joint venture to petitioner? If they were, then we do not think petitioner would be taxable on the part of the profits paid to the recipients of his bounty, even though such profits arose out of a gift of property from him. M. J. Sullivan, supra; Robert Jemison, supra; Frederick H. Hoffman, 3 B. T. A. 964.
Petitioner in his fifth assignment of error contends, “No profit accrued to members of joint venture until after sale of corporate assets October 25, 1920.” Counsel for petitioner, in support of this assignment of error, argue in their brief as follows:
It is submitted that it was impossible for any profit to accrue to petitioner and bis associates until the joint venture bad culminated in an actual sale. It was not until after October 25, 1920, the date on which the sale occurred, that any profit of any kind or nature arose to petitioner and his associates.
*948 By the terms of the contract of sale of October 25, 1920, It was agreed that the $1,250,000.00 hereinbefore referred to was to be treated as a credit toward the purchase price and that the balance due, namely $1,450,000.00, was to be paid in installments as set forth in the contract. It is submitted that these payments were made to the Michigan Iron and Land Company, the vendor under the contract of sale, that they did not constitute income to the joint venture, or any member thereof, until the Michigan Iron and Land Company began paying liquidating dividends. Payment to a corporation is not payment to its stockholders and profit accruing to a corporation is not profit to its stockholders unless and until same is distributed to the stockholders. It follows, as a matter of law, that the members of this joint venture did not derive any income or profit from the joint venture until it was paid them by the corporation in the form of liquidating dividends received through Roberts P. Hudson, trustee.
We tliink the foregoing contention is correct and if we could find that the eight above-named beneficiaries were the actual owners of stock in the Michigan Land & Lumber Company in their own right, even though they did receive it as a gift from petitioner, they would be entitled to their share of the liquidating dividends and the profits resulting from such liquidation would be taxable to them and not to the petitioner. But we hold that the interest set apart to them in the so-called declaration of trust of May 15, 1920, was simply a designation of the share of profits which they were to receive out of the residuary interest belonging to petitioner. Under such circumstances we think these payments made during the taxable years by Roberts P. Hudson, trustee, to Adelia Jones Carney, Marie I. Jones, Emma Jones Hogan, Georgiana Brown, Charles R. Osborn, Stephen P. Osborn, Eugene B. Osborne, and Emma O. Reed were made out of the share of profits which belonged to petitioner and were taxable to him. Ormsby McKnight Mitchel, 1 B. T. A. 143: Ella Daly King, Executrix, 10 B. T. A. 698; Charles C. Ruprecht, 16 B. T. A. 919.
In Ormsby McKnight Mitchel, supra, we said:
As between the parties to tbis agreement it may be legal and enforceable and tbe taxpayer may be trustee of one-lialf tbe income be receives from tbe partnership of which be is a member and compellable to account therefor, but tbis is of no materiality in considering the question before us. Tbe income from taxpayer’s interest in the partnership is first income to him, and no matter bow be tries to dispose of it, or does dispose of it, it is taxable to him as income from bis interest therein.
In Ella Daly King, Executrix, supra, we said:
We have heretofore held that a person’s tax liability can not be lessened by a transfer of income already earned or expected to be earned. Tbe very act of transfer is an exercise of enjoyment of tbe fruits of ownership of property and measures the transferor’s ability to contribute to tbe cost of government.
In Charles C. Ruprecht, supra, we said:
We are satisfied that tbe petitioner’s agreement with Gardner as to tbe equal division of profits arising from their joint undertakings was a legally *949 enforceable one, and that he was entitled as a matter of law to one-half of the sum collected in 1921. The mere fact that he saw fit to surrender his rights to Gardner can not, in our opinion, defeat the rights of the Government to demand a tas from the petitioner upon his share of that payment. See Arthur G. Levering, 5 B. T. A. 616, in which we held that the share of profit from a joint venture was income to the venturer notwithstanding the fact that it was transferred to another immediately upon its receipt.
This disposes of all petitioner’s assignments of error except the fourth, in which he contends that “ payments made to the petitioner during the period in question were not profit and payments of income tax based thereon constitute overpayments of tax.” We think this contention is without merit. The $100,000 paid to petitioner in 1920 and the $75,000 paid to him in 1921 and the $100,000 paid to him in 1922, and by him returned as income for the respective years, were paid to him by Roberts P. Hudson, trustee, after the trustee had paid the full amount of the costs of acquiring the stock of the Michigan Iron & Land Company, Ltd., and after all expenses connected therewith had been paid. The amounts thus received by petitioner were profit and taxable income to him and there has been no overpayment of his tax.
Reviewed by the Board.

Decision will be entered under Rule 50.