*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CARLA SEGAAR,

        Plaintiff-Appellant,

v

COUNTY OF OTTAWA,

        Defendant Third-Party Plaintiff-
        Appellee,

and

OTTAWA SAND COMPANY LLC,

        Third-Party Defendant.

UNPUBLISHED
February 1, 2024

No. 365185
Ottawa Circuit Court
LC No. 20-006289-CH

Before: REDFORD, P.J., and RIORDAN and FEENEY, JJ.

PER CURIAM.

In this adverse-possession case, plaintiff, Carla Segaar, appeals as of right the trial court's opinion and order in favor of defendant, Ottawa County, finding plaintiff had no cause of action. Following a bench trial, the trial court ruled that plaintiff failed to establish that her and her predecessor's use of the "Possessed Property"[1] was "hostile" to defendant for the purposes of an adverse-possession claim. On appeal, plaintiff challenges that ruling. We agree with plaintiff and reverse the trial court's finding that plaintiff failed to establish the "hostile" element of her claim.

## I. FACTS

---

[1] The parties and the trial court refer to the property in dispute as the "Possessed Property." Thus, we will do so as well.

On October 5, 2020, plaintiff filed her complaint against defendant, alleging as follows. Plaintiff owns real property located in the City of Ferrysburg, Ottawa County, commonly known as 18690 North Shore Drive. Plaintiff assumed title to the real property under a warranty deed from Michael and Sharon Zajac, as trustees of The Zajac Trust, on June 15, 2018. The Zajacs, in turn, assumed title to the real property under a warranty deed from Roger and Alice Nielsen on September 7, 1983.[2] Defendant owns the adjacent property, which encompasses the Possessed Property, through a warranty deed from Ottawa Sand Company, LLC, recorded on August 1, 2018. The State of Michigan is the record title holder of the mineral rights of the adjacent property.[3]

Plaintiff alleged that a predecessor in interest, the Nielsens, installed a driveway on the Possessed Property in the early 1970s; that the Zajacs, plaintiff's immediate predecessor in interest, installed a storage shed and "play fort" on the Possessed Property in the 1980s; and that the Nielsens, the Zajacs, and plaintiff have treated the Possessed Property as their own during their respective periods of ownership. However, plaintiff alleged, on or about October 1, 2019, a representative of defendant contacted her and sought to evict her from the Possessed Property. Thus, plaintiff filed the instant complaint to quiet title in the Possessed Property.

The parties filed a joint stipulation of facts in advance of the bench trial. The joint stipulation of facts, in addition to the facts alleged above, stated, in relevant part:

> ¶ 7. Prior to receiving the Warranty Deed from the Nielsens on August 31, 1983, the Zajacs possessed the Deeded Property [i.e., the real property] from 1980 pursuant to a land contract purchase agreement with the Nielsens.
>
> * * *
>
> ¶ 9. The Possessed Property has been used by Plaintiff since acquiring the Deeded Property on June 14, 2018.
>
> ¶ 10. The Possessed Property was used and improved by the Zajacs during the time they owned or otherwise possessed the Deeded Property.
>
> ¶ 11. The Possessed Property was used and improved by the Nielsens before the Zajacs since the early 1970s.
>
> * * *
>
> ¶ 14. The Nielsens installed a driveway over and on a portion of the Possessed Property in the early 1970's that angled in from North Shore Drive to the back of the house located at 18690 North Shore Drive.
>
> ¶ 15. After the Zajacs took possession of the Possessed Property in approximately 1980, the Zajacs expanded the improved area used for personal,

---

[2] The real property was formally transferred from the Zajacs to The Zajac Trust in May 2015.

[3] Plaintiff has instituted a separate action in the Court of Claims in that regard.

family and guest purposes which included the drive constructed by the Nielsens in the early 1970's and added areas for the additional parking and storage of family and guest vehicles; the construction of a storage shed and play fort with a slide and swing set equipment.

¶ 16. As part of the Zajacs' Seller's Disclosure Statement delivered to Plaintiff as part of the sale of the Deeded Property, the Zajacs communicated their possession and use of the Possessed Property to Plaintiff as the prospective purchaser with the following language:

> *The back drive area is on neighbor's property. This area has been used by us and previous owner for over 40 years.*

\* \* \*

¶ 19. The County operates a park on the County Property known as Ottawa Sands County Park (the "Park"). After purchasing the County Property in 2019, representatives of the County communicated with Plaintiff indicating that the County intended to take possession of the Possessed Property including the removal of Plaintiff's personal property and the structures, retaining walls, parking and/or yard areas located within the Possessed Property in the fall of 2019 or spring of 2020.

¶ 20. The Possessed Property constitutes a small, unused portion of the Park. Because of the small size of the parcel in question and its location, the Plaintiff's possession of the Possessed Property does not compromise or interfere with the operation of purposes of the Park.

\* \* \*

¶ 22. Prior to the County's ownership of the County Property and its use thereof as the Park, the County's predecessors in title operated commercial sand and/or other material/mineral mining thereon, including operations by Construction Aggregates Corporation and/or its predecessors, successors and/or affiliates.

¶ 23. During the time which the County Property was used for commercial sand mining purposes, the use and possession of the Possessed Property by Plaintiff, the Zajacs and the Nielsens did not materially interfere with the mining or other commercial operations conducted on the County Property.

Also, plaintiff submitted the affidavit of Roger Nielsen, which stated, in relevant part:

¶ 4. In the early 1970s, Alice and I constructed a driveway located east of the above property then owned by a sand mining company so we could use and enjoy property also located east of the above described property commonly known as 18690 North Shore Dr.

¶ 5. At the time that we constructed the driveway, we knew it was on the sand mining company's property. We took no efforts to disguise or hide our use of the property, nor of the driveway we built on the sand mining company's property, nor of the use and possession of the other portions of the sand mining company's property.

¶ 6. The sand mining company completely ignored our use of its property, despite our use being open, obvious and visible to everyone driving by on North Shore Drive. We used and possessed the property however and whenever we wished and used it in whatever way we wished with no objection from and no permission given by the sand mining company.

* * *

¶ 8. At no time did anyone from the sand mining company ever speak to Alice or I about our use and possession of the property to the east of 18690 North Shore Dr., and no one ever gave us permission or consent to use or possess that property in writing or verbally.

A bench trial took place on December 1, 2022. At the beginning of trial, the parties noted that Roger Nielsen would not be testifying, and that they would rely upon his deposition testimony and affidavit. The issues at trial largely concerned the "hostility" element of adverse possession.

Plaintiff testified that when she purchased the real property, the Zajacs informed her that the Possessed Property was "used . . . without no problem and that they did not have permission and that it had been adversely possessed, but they never really went after it in the court." The Zajacs reiterated that "[t]hey used it freely and we would be able to use it as well and it's technically rightfully theirs because they had used it for way more than 15 years without permission." Plaintiff continued to use the Possessed Property at the time of trial.

Michael Zajac testified that when he first moved into the real property in 1980,

[i]t was very obvious that [the Possessed Property] was being used by the Nielsens. It was worn. They had – I should not say "they". There was, if you will, improvement. There was bottom ash on the driveway. If you were to look at that area, you would see the dune that I mentioned earlier. I said it ended, but it didn't end naturally. It had been dug out and made flat. There was a – they had a shed on that property. It was obviously being used and it – there was no distinction between that property and the actual property I bought.

Zajac explained that he constructed a retaining wall on the Possessed Property in 2013, that he improved the "parking area" and planted some nearby trees over the years, and that he constructed a new shed and a swing set on the Possessed Property in the 1980s. He also added some "broken concrete" to slow erosion in the 1980s as well. Additionally, Zajac placed landscaping in the area after 2013. Further, Zajac regularly maintained the driveway during the winters.

-4-

Zajac testified that defendant's predecessors in title never discussed his use of the Possessed Property with him until about 2015, when Phil Johnson told him that "the owner had known that we had been using the property or occupying the property and he told us that the owner did not have any problem with us doing that."

Finally, Zajac testified that at some point in the 1980s, he "came home one day and [he] saw [a wire] fence" on the Possessed Property in a location that would have limited his use of that property. He promptly removed the fence posts, wrapped up the fence, and placed the materials nearby. Apparently, the materials then were left untouched until the instant litigation. Zajac "presumed" that the fence was placed by Construction Aggregates, but he had no specific reason to believe so.

Phil Johnson testified that he provided consulting services to Construction Aggregates for several years, and that he occasionally used the driveway on the Possessed Property once every few years between 1992 and 2015. He was aware that the Possessed Property was owned by Construction Aggregates, or one of such related companies, but he believed that the Zajacs' use did not interfere with mining operations. He testified that in 2015, he spoke with the Zajacs and informed them that "CACM"[4] had been aware of their use of the Possessed Property for many years and that they were permitted to do so. He was unaware of any express communication of permission to the Zajacs before that time.

In her post-trial brief, plaintiff argued that she established all elements of adverse possession, while defendant argued that she failed to establish the elements of "hostility" and "exclusivity" of use. Specifically, defendant argued in its post-trial brief that "the use of the Possessed Property was always known by, allowed or acquiesced to by the true owner of the property . . . ."

Excerpts of Roger Nielsen's deposition were included as Exhibit B to defendant's brief. In short, Nielsen testified that when he constructed the driveway on the Possessed Property in the 1970s, he used gravel from Construction Aggregates and had its permission in that regard. Specifically, Nielsen testified as follows:

Q. When you spoke to the people at Construction Aggregates, was it your understanding that they were giving you permission to use this area of land?

A. It was my position that they were letting us use it.

* * *

Q. Did you construct the driveway after you spoke to the people at Construction Aggregates to get their permission to do so?

A. That I don't recall.

---

[4] CACM is a company related to Construction Aggregates.

Q. Do you recall how much gravel you brought in?

A. I don't but it was at least – and it came from Construction Aggregates. It was at least one front end loader load of that or potentially a couple.

Q. The material that you used you obtained from Construction Aggregates?

A. Correct.

* * *

Q. So based on what you have described for me it's clear that the Aggregates, Construction Aggregates was aware that you were putting in the driveway?

A. Yes.

On February 15, 2023, the trial court entered its written opinion and order in favor of defendant, reasoning as follows:

In the case at bar, defendant argues that plaintiff has failed to meet the heightened evidentiary burden of establishing the "hostile" element by "clear and cogent" evidence. This Court agrees. In support of its argument, defendant first points to the September 2022 deposition testimony of Roger Nielsen (an owner of the Deeded Property prior to plaintiff), where he stated that Construction Aggregates knew about and allowed his use of the Possessed Property and improvement to the two-track drive . . . .

* * *

Aside from Mr. Nielsen's testimony, defendant provides additional evidence to show that permission was in fact given for use of the Possessed Property. For example, defendant proffers a statement from the Zajacs (owners of the Deeded Property after the Nielsens) from a meeting with Phil Johnson, an agent of and consultant to Construction Aggregates. In the statement, the Zajacs state that they met with Mr. Johnson, and he said that Construction Aggregates were aware "for many years" of the driveway (on the Possessed Property) and had no objections to the Zajacs' use of it. . . .

Plaintiff has not established that she exceeded the permissible use of the property that was originally given to Mr. Nielsen. This area has been consistently used for the parking of vehicles and for uses consistent with a single-family dwelling—the same type of activity for which Construction Aggregates was aware and gave the Nielsens permission. Originally, there was a small shed on the property. It is unknown who built this shed, which was removed at a later point and a second similar shed was installed by the Zajacs in a different location within

-6-

the possessed land. Regardless, the replacement/moving of the shed did not increase the use of the land so as to be inconsistent with the earlier permissive use. The Court's inspection of the land confirmed this. Even if the Zajacs' building of the retaining wall and taking other action in 2013 was inconsistent with the permission originally given by Construction Aggregates, that use has not met the 15-year time requirement. The construction of a swing set or play set on the possessed property and used by the Zajacs for a period of time was consistent with the permission that was originally given to the Nielsens.

Plaintiff now appeals.

## II. STANDARD OF REVIEW

"[T]his Court reviews equitable actions de novo, including actions to quiet title." *Burkhardt v Bailey*, 260 Mich App 636, 646-647; 680 NW2d 453 (2004). "The trial court's findings of fact are reviewed for clear error[.]" *Id*. at 647. "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *Walters v Snyder*, 239 Mich App 453, 456; 608 NW2d 97 (2000).

## III. DISCUSSION

Plaintiff argues that the trial court clearly erred by finding that she failed to show that her and her predecessor's possession of the Possessed Property was not "hostile" for the purposes of adverse possession. We agree.

"Ordinarily, an action for the recovery or possession of land must be brought within 15 years after it accrues." *Houston v Mint Group, LLC*, 335 Mich App 545, 558; 968 NW2d 9 (2021).

> A claim of adverse possession requires clear and cogent proof that possession of the disputed property has been actual, visible, open, notorious, exclusive, continuous, and uninterrupted for the statutory period. The use of the property must be hostile, that is without permission and in a manner that is inconsistent with the rights of the true owner. [*Cove Creek Condo Ass'n v Vistal Land & Home Dev, LLC*, 330 Mich App 679, 715; 950 NW2d 502 (2019) (quotation marks and citation omitted).[5]]

"The term 'hostile' as employed in the law of adverse possession is a term of art and does not imply ill will; rather, hostile use is that which is inconsistent with the right of the owner, without permission asked or given, and which would entitle the owner to a cause of action against the intruder." *Houston*, 335 Mich App at 559 (quotation marks and citations omitted). "Peaceable

---

[5] "[I]n an adverse possession case, for a party to establish possession by 'clear and cogent evidence,' the evidence must clearly establish the fact of possession and there must be little doubt left in the mind of the trier of fact as to the proper resolution of the issue." *McQueen v Black*, 168 Mich App 641, 645 n 2; 425 NW2d 203 (1988).

occupation or use by acquiescence or permission of the owner cannot ripen into title by adverse possession, no matter how long maintained. Hostility is of the very essence of adverse possession." *King v Battle Creek Box Co*, 235 Mich 24, 35; 209 NW 133 (1926).

"Finally, successive periods of adverse possession by different parties can be joined or 'tacked' to satisfy the 15-year statutory period, but only if there was privity of estate." *Houston*, 335 Mich App at 560 (citation omitted).

In this case, the trial court found that plaintiff failed to establish the "hostile" element of her claim for three reasons. First, Roger Nielsen testified at his deposition that "Construction Aggregates knew about and allowed his use of the Possessed Property and improvement to the two-track drive" when he constructed the driveway in the 1970s. Second, "the Zajacs state[d] that they met with Mr. Johnson [in 2015], and he said that Construction Aggregates were aware 'for many years' of the driveway (on the Possessed Property) and had no objections to the Zajacs' use of it." Third, the Possessed Property "has been consistently used for the parking of vehicles and for uses consistent with a single-family dwelling—the same type of activity for which Construction Aggregates was aware and gave the Nielsens permission."

With regard to the first reason, the parties devote much briefing to whether the trial court clearly erred by finding that Nielsen was given permission to use the Possessed Property in the 1970s. However, plaintiff secondarily argues, as she did in the trial court, that whether Nielsen was given permission is not relevant because the Zajacs' use of the Possessed Property themselves is sufficient to establish adverse possession.

We agree with defendant that the trial court did not clearly err by finding that Nielsen was given permission to use the Possessed Property in the 1970s. As the trial court observed, Nielsen testified as follows:

> Q. When you spoke to the people at Construction Aggregates, was it your understanding that they were giving you permission to use this area of land?
>
> A. It was my position that they were letting us use it.

Later, Nielsen explained that Construction Aggregates actually provided him with the gravel necessary for the driveway:

> Q. Do you recall how much gravel you brought in?
>
> A. I don't but it was at least – and it came from Construction Aggregates. It was at least one front end loader load of that or potentially a couple.
>
> Q. The material that you used you obtained from Construction Aggregates?
>
> A. Correct.

Given this testimony, the trial court had a factual basis for finding that Nielsen was given permission to use the Possessed Property, both through Nielsen's personal understanding and through the fact that Construction Aggregates aided his use of that property. While plaintiff

identifies contradictory statements in his deposition and affidavit, such contradictions are for the trial court to resolve. *De Longpre v Carroll*, 331 Mich 474, 477; 50 NW2d 132 (1951) (observing that "[i]t was . . . for the trial court to weigh the conflicting testimony and to determine the actual facts") (quotation marks and citation omitted).

However, while the trial court did not clearly err by finding that Nielsen was given permission to use the Possessed Property, we agree with plaintiff that the Zajacs' use of that property by themselves was sufficient to establish the "hostile" element of adverse possession. This is because the transfer of real property to a new owner constitutes a revocation of a permissive license to the previous owner, and the new owner's possession becomes adverse. See *Beechler v Byerly*, 302 Mich 79, 82; 4 NW2d 475 (1942) ("If the original use before 1881 was permissive only, we must hold, as we have heretofore, that when plaintiffs' property was conveyed to a new owner, in 1888, the license was revoked and the use was adverse."); *Sallan Jewelry Co v Bird*, 240 Mich 346, 348; 215 NW 349 (1927) ("This court has held in several cases that a change in the title destroys the permission."). As our Supreme Court more recently explained:

> By definition, a license is a permission to do some act or series of acts on the land of the licensor without having any permanent interest in it. In general, a license is revocable at will and is automatically revoked upon transfer of title by either the licensor or licensee. [*Kitchen v Kitchen*, 465 Mich 654, 658-659; 641 NW2d 245 (2002) (cleaned up).]

Thus, assuming that Nielsen was granted permission to use the Possessed Property for his driveway, that permission was presumptively revoked when he transferred ownership of the real property to the Zajacs in 1983 by land contract. Consequently, the Zajacs began adversely possessing the Possessed Property in 1983, and the 15-year statute of limitations began anew at that time. See *Beechler*, 302 Mich at 82.[6]

With that in mind, the only fact identified by the trial court and defendant that could defeat the Zajacs' "hostile" possession of the Possessed Property is the fact that Johnson told Michael Zajac in 2015 that Johnson, on behalf of Construction Aggregates, was aware that the Zajacs had been using the Possessed Property and that doing so was unobjectionable notwithstanding that it was owned by Construction Aggregates. This, according to the trial court and defendant, shows that the Zajacs used the Possessed Property with permission, thus defeating the "hostile" element. We disagree.

Permission may be expressed or implied. See *Swartz v Sherston*, 299 Mich 423, 425; 300 NW 148 (1941). For example, the common use of real property by "friendly" neighbors may constitute implied permission. See *King*, 235 Mich at 34 ("The undisputed testimony of both sides shows that from the time the common grantor sold plaintiff's property to the original grantee in

---

[6] Admittedly, plaintiff does not cite *Beechler* and other such authorities in her brief on appeal. However, she does argue that "to the extent that the trial court relied upon Mr. Nielsen's faulty deposition testimony in its judgment that Mr. Nielsen's testimony did not rise to the level of 'clear and cogent' evidence, Appellant should still recover based upon the Zajacs' period of adverse possession which began in 1980 . . . ."

his chain of title the owners and occupants of these adjoining properties were in friendly relations, conducting their respective activities in the neighborly comity such relations give rise to, until this friction arose.").

Here, because Johnson did not expressly communicate permission to the Zajacs until 2015, that permission must have been implied to defeat the "hostile" element. In other words, because the Zajacs began adversely possessing the Possessed Property in 1983, and because the 15-year statutory period thus expired in 1998, the "hostile" element may only be defeated in this case if defendant's predecessors in title, including Construction Aggregates, are deemed to have given implied permission through silent knowledge. In our view, the word "permission" in this context requires more than silent knowledge. Instead, it must be somehow communicated to the person possessing the property, even if impliedly. This Court refers to "permission" in the context of the "hostile" element as "permission asked or given." See, e.g., *Houston*, 335 Mich App at 559. It is unclear how the Zajacs could be "given" permission if it was not communicated to them. Moreover, our Supreme Court has explained that "[i]f one sleeps on his rights for fifteen years as against an intruder of his real estate, whether such at time of entry, or after permissive entry by known repudiation of leave, and assertion of right, the title is lost to the sleeper and vested in the usurper." *Gardner v Gardner*, 257 Mich 172, 176; 241 NW2d 179 (1932). The fact that nobody communicated any knowledge or permission to the Zajacs until 2015 suggests that defendant's predecessors in title slept on their rights. Thus, we conclude that the Zajacs were never given permission to use the Possessed Property and, as a result, their use of the Possessed Property was "hostile" for the purposes of adverse possession from 1983 through, at least, 2015.

To summarize, while the trial court did not clearly err by finding that the Nielsens were given permission to use the Possessed Property, that permission was revoked when the Nielsens transferred title to the Zajacs in 1983. The Zajacs thus had "hostile" possession of the Possessed Property until Johnson communicated permission to them in 2015, which was beyond the 15-year statute of limitations. The trial court clearly erred by finding otherwise for the purposes of the "hostile" element, and we reverse.[7]

## IV. CONCLUSION

We reverse the trial court's finding that plaintiff failed to establish the "hostile" element of her adverse-possession claim, and remand to that court for further proceedings. We do not retain jurisdiction.

/s/ James Robert Redford
/s/ Michael J. Riordan
/s/ Kathleen A. Feeney

---

[7] Further proceedings, or at least further factual findings by the trial court, may be necessary on remand regarding the remaining elements of adverse possession, particularly the "exclusivity" element.