JAMES HANEY, ADMINISTRATOR, v. TOWN OF LINCOLNTON.

(Filed 31 October, 1934.)

1. Appeal and Error J g—

    Where an aspect of the law in a case is not mooted on the hearing or debated in the briefs on appeal it will not be considered in determining the appeal.

2. Municipal Corporations E c—Duty of municipality in respect to its streets.

    A municipality is not an insurer of the safety of its streets, but is required to use ordinary care and due diligence to see that they are safe for travel.

3. Same—Duty of municipality to place guards at dangerous and exposed places adjacent to its streets.

    It is the duty of a municipality to place some guard at dangerous and exposed places adjacent to its streets where the happening of accidents to motorists exercising ordinary care for their own safety may be reasonably anticipated from the failure to place such guards, and whether the danger at a particular place is sufficiently imminent to require guards must be decided on the facts of each particular case.

4. Same—Under facts of this case place of accident was not so imminently dangerous as to require city to place guard opposite street end.

    A street within the corporate limits of defendant city intersected, but did not cross, a paved highway.  There was a dirt shoulder four to eight feet wide on the highway opposite the intersection, and then a gradual downward slope with a total drop of six to ten feet.  The highway had been widened where the street intersected it so that the hard surface at the intersection was something over thirty feet wide.  Plaintiff's intestate was killed when a car in which she was riding was driven along the street toward the intersection, and over the embankment opposite the intersection, and turned over:  *Held,* the failure of the city to place a guard at the street end did not breach its duty to exercise ordinary care to keep its streets safe for travel to the injury of plaintiff's intestate.

5. Same—Active negligence of driver held to insulate failure of city to erect guard at street end even if such failure amounted to inactive negligence.

    A street within the corporate limits of a city intersected, but did not cross, a paved highway.  There was a dirt shoulder four to eight feet

wide on the highway opposite the intersection, and then a gradual downward slope with a total drop of six to ten feet. The highway at the intersection had been widened so that the hard surface at the intersection was something over thirty feet wide. The city had not placed a guard at the street end. The driver of the automobile in which plaintiff's intestate was riding drove the car down the street, across the highway and over the embankment, turning the car over and killing plaintiff's intestate. The accident occurred late at night after the street light at the intersection had been turned off. The night was dark and foggy, and the lights on the car were burning dim. The driver of the car testified that he was driving at a slow rate of speed, but that he did not see the embankment in time to stop the car and avoid the accident: *Held*, the driver's active negligence was the immediate cause of the accident and insulated the conduct of the city even though the failure of the city to erect a guard at the street end amounted to inactive negligence.

**6. Negligence B c—**

The intervening active negligence of a responsible third party will insulate the conduct of defendant, even though it amounts to inactive negligence, where the conduct of defendant would not have resulted in injury except for such intervening negligence.

CLARKSON, J., dissents.

APPEAL by defendant from *Oglesby, J.,* at January Term, 1934, of LINCOLN.

Civil action to recover damages for the death of plaintiff's intestate, Sue Gurley, which occurred in the town of Lincolnton on Christmas morning, 1932, and is alleged to have been caused by the wrongful act, neglect, or default of the defendant.

The facts are these: The deceased, a school girl 17 years of age, Guy Barringer, age 19 or 20, James Haney and Miss Hayes left Hickory between 3:00 and 3:30 o'clock in the morning and reached Lincolnton about 5:00 a.m. en route to Shelby, and thence to York, S. C., where Haney and Miss Hayes were to be married. They were riding in a five-passenger 1928 Pontiac sedan. Barringer was driving and Miss Gurley was on the front seat with him. Haney and his fiancee occupied the rear seat. The trip was the result of a prearranged plan, the automobile having been secured for the purpose from Barringer's father, and all four were up the entire night, dining, dancing and preparing for the journey. None had had any sleep. There was no drinking in the party.

The night was dark; the weather inclement, foggy and drizzling rain. The lights on the automobile were dim, did not show very far in front, shone right down on the road. Barringer was familiar with the road leading out of Lincolnton to Shelby, had spent a good part of the summer there, but had never driven a car over it. They reached Lincolnton before day, drove around the square and out Church Street to

Mill Street, the old Lincolnton-Shelby highway prior to the construction of the new Lincolnton-Shelby road. Haney remarked he thought they were on the wrong road; Barringer replied he knew that was the Shelby road when he was there: "I knew they had a new road built and I thought it had been extended straight on."

Church Street is paved with sheet asphalt and is about eighteen feet wide. It comes into Mill Street at right angles, but does not cross it. Mill Street is a paved highway going in the direction of Shelby. It is paved in the opposite direction only a short distance—about four feet. The paving at the corner of the intersection of Church and Mill streets had been widened eight or ten feet on the inside of the curve in addition to the regular eighteen feet, so as to make the turn easier. It had been in this condition for seven years. Church Street is practically level as it goes into the intersection.

Directly across from where Church Street intersects with Mill Street, and on the west side of Mill Street, there is a dirt shoulder "of possibly 6 or 8 feet beyond the west edge of the hard surface, which had been grassed—the usual six-foot shoulder that you find on roads." There was other evidence that the dirt shoulder was only four feet in width. Beyond this, there is a declivity, fill, or embankment, which slopes gradually from the shoulder of the road to a depth of from 6 to 10 or 12 feet.

Barringer failed to turn into Mill Street, ran directly across it, over the shoulder, down the embankment, into the fill, which was wet and soggy, turned the car over, and Miss Gurley was killed.

Barringer testified that he was traveling westward along Church Street at a rate of from fifteen to twenty miles an hour; that he did not observe the road turned to the left until he crossed the hard-surfaced part of Mill Street, too late to avoid going down the embankment; that while the lights on Main Street were burning, there was no light at this intersection; nor were there any guard rails, barriers, posts, or signs to warn travelers of the unguarded ravine; and further, on cross-examination: "There was not anything to keep a man from following this pavement, and there wasn't anything there to tell us to turn. . . . There wasn't anything to keep me from following it if I was watching the road. I was driving this car no faster than 15 or 20 miles, and I just drove down that embankment. I did not tell Mr. Nicholson that I was perfectly familiar with that road, but that I got to the turning-place quicker than I thought."

There was also evidence introduced to show that four or five other cars, within the last several years, had failed to follow the paved road and had gone over this embankment, some in the daytime, some in the nighttime, but no injuries of any consequence had hitherto occurred.

The city electrician testified that there was one street light in the neighborhood of this intersection. "It was not burning at 5 o'clock Christmas morning, 1932. . . . We cut off the lights in the residential sections at 12:30 or 1:00 o'clock, but on the main street they burn all night."

Motion to nonsuit under Hinsdale Act, C. S., 567; overruled; exception.

The defendant offered no evidence.

The case was submitted to the jury on the issues of negligence and damages, and resulted in a verdict of $10,000 for the plaintiff. ·

From the judgment entered thereon the defendant appeals, assigning errors, the principal one being directed to the refusal of the court to grant the defendant's motion for judgment as of nonsuit.

*Jonas & Jonas, L. E. Rudisill, R. H. Shuford, and R. L. Huffman for plaintiff.*

*W. H. Childs, S. M. Roper, and Ryburn & Hoey for defendant.*

STACY, C. J., after stating the case: It is not debated on brief, nor was it mooted on the hearing, whether plaintiff's intestate and her companions had embarked upon a joint enterprise, or joint venture, so as to render the contributory negligence of the driver imputable to the other occupants of the car, hence we omit any consideration of this view of the matter. For history, philosophy, definition, and application of the doctrine of joint enterprise, see: *Potter v. Florida Motor Lines,* 57 Fed. (2d), 313 (which contains a clear exposition of the principles underlying the doctrine); *Carlson v. Erie R. Co.,* 305 Pa., 431, 158 Atl., 163, 80 A. L. R., 308 (with annotation); *Campbell v. Campbell,* 104 Vt., 468, 162 Atl., 379, 85 A. L. R., 626 (with annotation); *Keiswetter v. Rubenstein,* 235 Mich., 36, 209 N. W., 154, 48 A. L. R., 1049 (with annotation); *Charnock v. Refrigerating Co.,* 202 N. C., 105, 161 S. E., 707; *Butner v. Whitlow,* 201 N. C., 749, 161 S. E., 389; *Albritton v. Hill,* 190 N. C., 429, 130 S. E., 5; *Williams v. R. R.,* 187 N. C., 348, 121 S. E., 608 (concurring opinion); *Pusey v. R. R.,* 181 N. C., 137, 106 S. E., 452; *Eubanks v. Kielsmeier,* 171 Wash., 484, 18 P. (2d), 48, as reported in 34 N. C. C. A., 388, with full annotation upon the subject.

And further, by way of elimination, it is not alleged that there was any defect, excavation, or obstruction, in the street itself, which had been permitted to remain there for an unreasonable length of time, without signals or lights to warn the traveling public, as was the case in *Pickett v. Railroad and the Town of Newton,* 200 N. C., 750, 158 S. E., 398; nor that the street abruptly terminated in a river without barricade or lights, as was the case in *Willis v. New Bern,* 191 N. C., 507, 132 S. E., 286.

The gravamen of the complaint is, that the elbow or sharp turn in the highway created by the intersection of Church and Mill streets is immediately adjacent to a dangerous declivity which calls for lights, signs, railing, or barrier to make it safe for travel in the exercise of ordinary care, and that the failure on the part of the municipality to guard or to warn the public of such danger is negligence, rendering it liable in damages for injuries to travelers which proximately result from a breach of its duty in this respect. *Speas v. Greensboro,* 204 N. C., 239, 167 S. E., 807.

The rule applicable is stated in 13 R. C. L., 421, as follows: "It is well settled that it is the duty of a municipal or *quasi*-municipal corporation to erect railings or barriers along the highway at places where they are necessary to make the same safe and convenient for travelers in the use of ordinary care, and that it is liable for injuries to travelers resulting from a breach of its duty in this regard. This is true though the danger arises from structures or excavations outside of the highway, and on the land of adjoining owners, when they are in the general direction of travel upon the highway. Whether or not a railing or barrier is necessary in a given case depends largely upon the circumstances of the particular locality in reference to which the question arises. Among the facts material to be considered are the character and amount of travel, the character and extent of the slope or descent of the bank, the direction of the road at the place, the length of the portion claimed to require a railing, whether the danger is concealed or obvious, and the extent of the injury likely to occur therefrom. A number of courts have laid down the rule that the danger must be of an unusual character and one that exposes travelers to unusual hazards, such as bridges, declivities, excavations, steep banks, or deep water."

Our own decisions are accordant with this statement. *Willis v. New Bern, supra,* and cases there assembled.

It is further established by the decisions in this jurisdiction that a municipality is not held to the liability of an insurer of the safety of its streets, but only to the exercise of ordinary care and due diligence to see that they are safe for travel. *Alexander v. Statesville,* 165 N. C., 527, 81 S. E., 763; *Seagraves v. Winston,* 170 N. C., 618, 87 S. E., 507; *Fitzgerald v. Concord,* 140 N. C., 110, 52 S. E., 309.

With respect to the duty of notification or fortification against danger which a municipality owes to those using its streets, it has often been said that such duty is to use ordinary care to warn and to protect persons against injury who are themselves exercising ordinary care for their own safety. It is the duty of a municipality to place some guard at dangerous and exposed places, where the happening of accidents from the failure to place guards may be reasonably anticipated. In relation to defects or obstructions in the streets themselves a responsibility may

arise somewhat different from a case involving danger outside of the traveled way. In the latter case, the question of negligence becomes one of reasonably anticipated consequences, and the duty is to use such means as may be necessary to prevent those consequences. *Watkins' Admr. v. City of Catlettsburg,* 243 Ky., 197, 47 S. W. (2d), 1032. The chief difficulty arises in determining whether, in a particular case, the danger is sufficiently imminent to require guards, signs, or barriers, and naturally each case must be decided upon its own state of facts. No hard and fast rule can be laid down that will apply alike to all conditions. *Shea v. Town of Whitman,* 197 Mass., 374, 83 N. E., 1096.

It was the judgment of those having this particular highway in charge that the situation was not such as to call for signs or guards, as the intersection had been widened 8 or 10 feet opposite the gulch side of Mill Street, making the width of the hard surface at the point of injury something over 30 feet. In addition to this, there was the dirt shoulder of from 4 to 6 or 8 feet, and then the gradual descent of the embankment. The duty required of the defendant was that of ordinary care. A searching investigation of the record leaves us with the impression that the evidence is wanting in sufficiency to warrant the inference that this duty was breached to the injury of plaintiff's intestate. *Blackwelder v. Concord,* 205 N. C., 792, 172 S. E., 392; *Briglia v. City of St. Paul,* 134 Minn., 97.

It further appears that the immediate cause of plaintiff's intestate's unfortunate death was the negligence of Guy Barringer, the driver of the car, and not that of the defendant. This doctrine of insulating the conduct of one, even when it amounts to inactive negligence, by the intervention of the active negligence of a responsible third party, has been applied in a number of cases. *Baker v. R. R.,* 205 N. C., 329, 171 S. E., 342; *Hinnant v. R. R.,* 202 N. C., 489, 163 S. E., 555; *Herman v. R. R.,* 197 N. C., 718, 150 S. E., 361.

Speaking to the subject in his valuable work on Negligence (sec. 134), Mr. Wharton very pertinently says: "Supposing that if it had not been for the intervention of a responsible third party the defendant's negligence would have produced no damage to the plaintiff, is the defendant liable to the plaintiff? This question must be answered in the negative, for the general reason that causal connection between negligence and damage is broken by the interposition of independent responsible human action. I am negligent on a particular subject-matter. Another person, moving independently, comes in, and either negligently or maliciously so acts as to make my negligence injurious to a third person. If so, the person so intervening acts as a nonconductor, and insulates my negligence, so that I cannot be sued for the mischief which the person so intervening directly produces. He is the one who is liable to the person injured."

The same rule announced by *Mr. Justice Strong* in *R. R. v. Kellogg,* 94 U. S., 469, regarded as sound in principle and workable in practice, has been quoted with approval in a number of our decisions. He says: "The question always is, Was there an unbroken connection between the wrongful act and the injury—a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? It is admitted that the rule is difficult of application. But it is generally held that, in order to warrant a finding that negligence, or an act amounting to a wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence, or wrongful act, and that it ought to have been foreseen in the light of attending circumstances."

It follows, therefore, that the demurrer to the evidence should have been sustained.

Reversed.

CLARKSON, J., dissenting: I think there was plenary evidence in this action for actionable negligence, to be submitted to the jury, as was done by the court below. The defendant introduced no evidence and at the close of plaintiff's evidence made a motion for judgment as in case of nonsuit. C. S., 567. The court below overruled this motion, in which I can see no error.

The issues submitted to the jury, and their answers thereto, were as follows: "(1) Was the death of Sue Gurley, plaintiff's intestate, caused by the negligence of the defendant town of Lincolnton, as alleged in the complaint? A. 'Yes.' (2) What damage, if any, is the plaintiff entitled to recover? A. '$10,000.' "

The court below rendered judgment on the verdict.

In *Speas v. Greensboro,* 204 N. C., 239 (241), the principle is laid down: "The exercise of due care to keep its streets in a reasonably safe and suitable condition is one of the positive obligations imposed upon a municipal corporation. The discharge of this obligation cannot be evaded on the theory that in the construction and maintenance of its streets the municipality acts in a governmental capacity, *Graham v. Charlotte,* 186 N. C., 649; *Willis v. New Bern,* 191 N. C., 507; *Michaux v. Rocky Mount,* 193 N. C., 550; *Hamilton v. Rocky Mount,* 199 N. C., 504.

"The court instructed the jury that the erection of the 'silent policeman' at the intersection of the streets was not enough to constitute negligence.(*Valley v. Gastonia,* 203 N. C., 664), and left to the determination of the jury the question whether the city had used due care in providing adequate lights. If the city failed to exercise such care, it was negli-

gent. *Bunch v. Edenton,* 90 N. C., 431; *Bailey v. Winston-Salem,* 157 N. C., 253; *Pickett v. R. R.,* 200 N. C., 750."

The old case of *Bunch v. Edenton, supra,* is applicable to this case. At page 433 is the following: "It appears in the record that one Lee owned a lot situate along and immediately adjoining Main Street in that town, and on the side of the lot next to, adjoining and bordering on the outer side of that street there was an excavation for the purpose of a cellar, eight feet deep, running immediately along the street the distance of forty feet, and extending back from it about sixty feet.

"The defendants had knowledge of this excavation. It was permitted to remain open and unenclosed for a month without any railing, fence, or other sufficient barrier to prevent persons passing that way from falling into it, and no light was placed at night on the street near this opening.

"The plaintiff, passing along that street on the sidewalk on a very dark night, was unable to see the pit, missed the sidewalk, fell into it and broke his thigh, doing him serious damage. The jury found that he did not by his negligence contribute to the injury to himself.

"The defendants contend generally that the plaintiff has no cause of action against them, and that if in any case they could be liable for injuries happening on the streets in said town, they could not be held liable in this case, *because the pit that occasioned the injury to the plaintiff was outside of the street and sidewalk.*" (Italics mine.)

At page 434: "It was the positive duty of the corporate authorities of the town of Edenton to keep the streets, including the sidewalks, in 'proper repair'—that is, in such condition as that the people passing and repassing over them might at all times do so with reasonable ease, speed and safety. And proper repair implies also that all bridges, dangerous pits, embankments, dangerous walls and the like perilous places and *things very near and adjoining the streets,* shall be guarded against by proper railings and barriers. Positive nuisances on or near the streets should be forbidden under proper penalties, and, when they exist, should be abated." (Italics mine.)

This "death trap" had been there for years, and by the exercise of reasonable care should have been known to the defendant. Four or five automobiles had run off of it at the same place. Perhaps a cost of less than $25.00 expended by the defendant in guarding and putting warning signs would have saved this young girl's life, or a light placed there by defendant, to show the declivity. Guy Barringer was at the wheel and beside him was Sue Gurley, who was killed when the car went down into the ravine. Guy Barringer testified: "Miss Sue Gurley did not have any interest in the car. I was driving that night. She did not own any part of the car." This made her a passenger, and the law is

10—207

well settled in this State that Barringer's negligence must be the sole and only proximate cause to prevent recovery.

James Haney and Miss Hayes (now Mrs. Haney) were going from Hickory by way of Lincolnton, Shelby, and then to York, S. C., to be married. It was Christmas morning, about 5 o'clock. Guy Barringer testified further: "I stayed down here a few summers before that, and that was the highway then. I knew they had a new road built, and I thought it had been extended straight on. *It was foggy and a fine mist of rain and we had to kinder creep along and we got up to this fill and went right over the end of it. I did not see any sign or anything and had our lights on dim and they shone right down on the road and they did not show very far in front. I was operating the car from 15 to 20 an hour between the Lutheran Church and the place we went over. I was driving on the right-hand side of the street. Main Street was lit up there, there was not any light down there. I did not see a thing, no kind of warning, no barrier or anything to indicate warning. The ravine was around eight or ten feet deep.* My front wheels were just off of the hard-surface road when I realized we were going over. I gave a caution, I forget the exact words I used, but something to the effect to grab yourselves, everybody look out, or something to that effect. I applied brakes, the pavement was slick, and they did not do much good. I tried to hold it straight, because I thought maybe it would not be deep and would not turn over, but it was wet and soggy. It is elevated to the north. The front wheels stuck in the mud and kindly twisted over on the right side. Miss Sue Gurley was on the right-hand front seat. She was sitting with her left knee up in the seat, sitting on her left foot, with her back kindly toward the door.

"As soon as it was over I asked if anybody was hurt. Miss Hayes and Jim in the back seat said they were not hurt and Sue did not answer. I tried to lift her up, I thought she had fainted; I could lift her up, but I could not get her head out. . . . *There were no lights on the street as we proceeded to the point where we went off, there were not any lights at all anywhere. My car was equipped with brakes and they were in good working order, and also equipped with lights, two headlights and dash light and tail light, and they were burning.* It was a model 1928 Pontiac. . . . I knew that was the Shelby road, but I did not tell him I knew that road. I was driving about fifteen to twenty miles an hour and my lights were burning. I drove right on to the point where this road turns around and just drove right on down the embankment. *I did not turn around the road at all. I did not know I was supposed to turn. I thought it went straight.* Yes, I looked. I had my lights on dim and I could see fifteen to twenty feet ahead of the front of my car. If I had turned them on full I could not have seen at all. I was driving at the rate of fifteen to twenty miles and my brakes were in good order.

Running at fifteen miles an hour, if I applied my brakes I could stop in five or six feet when the roads are not wet. I didn't apply my brakes until my front wheels were off of the pavement. I could have seen a distance of fifteen feet and could have stopped my car, if it had been dry, within six or seven feet. I did not apply my brakes until the front wheels were off the pavement, ready to start down. The ground was level—even with the road—*and we were going down a little grade and naturally that would make the light shine a little closer and nobody would know when something just dropped straight off*. You could see out there, but you couldn't see exactly (a black road) if there was one there, you could not tell whether there was one there or not. We were straining our eyes to see where we were. Yes, I could see fifteen feet in front of me. I could see fifteen feet of the road before I ran off. *I was looking, I was really watching the road that night*. I could see an ordinary road fifteen feet. I could see that night with my lights dim fifteen feet. What was the matter with me that I didn't see it until I left the pavement is that it takes a little time to do anything. It takes you longer to act than it does to look. I have driven enough to know that if I am driving in a fog that I have to keep a lookout. *There wasn't anything to keep a man from following this pavement, and there wasn't anything there to tell us to turn. That paving ran around here, but you couldn't see around the side.*" (Italics mine.)

J. O. Shuford testified: "Christmas, 1932, where Church Street comes into the intersection, the embankment went straight into the ravine. I had never noticed any barrier or sign there. I have noticed the place recently. There was one city street light in the neighborhood of that point—one on the corner. That light was not burning at 5 o'clock Christmas morning, 1932."

J. C. Blanton testified: "I had occasion to pass by this place often, most every day. There were no barriers at the end of the street at all, and no signs, and there has never been any that I know of."

Chief of Police Farris: "I know the point at which the wreck occurred. On 25 December, 1932, that was one of the streets of the town of Lincolnton. There was no fence or barrier of any kind up at this curve that I ever saw. That ravine at the end of this street, at that time, must have been four or five feet drop and kept getting deeper—six or seven feet deep—maybe more."

S. R. Warlick: "The ravine at the end of the curve has existed ever since the road was hardsurfaced, possibly twelve or fifteen years before the wreck. I have never observed any sign or warning on the road along toward this ravine, and never noticed any fence or barrier along there."

Hilliard Hoyle: "There were no signs or barricades at this intersection whatever. As I approached the scene of the wreck I could not see the car off down in there."

Grady Sisk testified: "No, there were not any street lights burning, and there were no signs or barricades. To my knowledge that place had been in that same condition ever since we lived there, right around five years; it was that way all that time. Q. State whether you ever saw any automobile wrecks at this point prior to that time where this car went over the embankment and wrecked? A. I have seen four or five cars run off that fill. Q. Off that same fill? A. Yes. Q. At the time you saw those cars go over that embankment, tell his Honor whether the road was in the same condition as it was on Christmas, 1932? A. Yes. Q. Now, tell of those wrecks that you remember and who they were that had the wrecks. A. Mr. Mull went off there." He also told of the others.

The court below charged the well-settled principle laid down in *White v. Realty Co.,* 182 N. C., 536 (538): "His Honor correctly charged the jury that if the negligence of McQuay, the owner and driver of the Ford car, was the sole and only proximate cause of plaintiff's injury, the defendant would not be liable; for, in that event, the defendant's negligence would not have been one of the proximate causes of the plaintiff's injury. *Bagwell v. R. R.,* 167 N. C., 615. But if any degree, however small, of the causal negligence, or that without which the injury would not have occurred, be attributable to the defendant, then the plaintiff, in the absence of any contributory negligence on his part, would be entitled to recover; because the defendant cannot be excused from liability unless the total causal negligence, or proximate cause, be attributable to another or others. 'When two efficient proximate causes contribute to an injury, if defendant's negligent act brought about one of such causes, he is liable.' *Wood v. Public Service Corp., supra,* and cases there cited." The evidence was to the effect that the plaintiff's intestate, Sue Gurley, was a passenger in the car. The negligence, if any, of Guy Barringer could not have been the sole and only proximate cause of Sue Gurley's death.

It is a matter of common knowledge that every place in North Carolina similar to that in the present controversy has, by the efficient State Highway Commission, placed barriers painted white, reflectors and white cross-bars to warn motorists of the danger of this semi-dead end on the State highway system. Those who ride the roads know this to be a fact. The learned, able and painstaking judge gave the contentions fairly on both sides of the controversy and the charge covered every aspect of the law applicable to the facts. A jury of twelve men "of good moral character and of sufficient intelligence" (C. S., 2312) heard the evidence and rendered the verdict against defendant—men living in the vicinity. If we are ever to lessen the appalling death toll, in North Carolina and elsewhere, of automobile accidents, the courts

must hold municipalities and others to due care in guarding these "death traps." A leading North Carolina daily has carefully gotten up facts under *"Deadly Roads,"* which are as follows: "During the 18 months the United States was in the World War, 684 North Carolinians were killed in battle, 238 died of wounds, 601 died of disease, 87 were killed in different ways, making the total of North Carolina men who gave their lives for their country 1,610.

"During that same period, 4,128 North Carolinians were wounded. During the period from 1928 through 1933, a total of 4,429 persons were killed in automobile accidents on North Carolina highways. During that period there were 20,624 accidents in which persons were killed or injured and 29,144 persons were injured.

"The highway death toll this year through July has been 450 and highway patrol officials have estimated that the death toll for the year will exceed 1,000. The deaths by years are: 673 in 1928; 690 in 1929; 777 in 1930; 762 in 1931; 674 in 1932; 853 in 1933. The toll of injuries by year is: 4,801 in 1928; 5,084 in 1929; 4,426 in 1930; 5,075 in 1931; 4,783 in 1932; and 4,975 in 1933."

I think beyond question that the judgment of the court below should be affirmed. It may mean from the majority decisions that municipalities will be penurious, negligent, and careless with its streets at the expense of human life and limb. This young girl's life was snuffed out, as the jury in the court below found, by the defendant not using due care to provide barriers and warnings; when it knew, or, in the exercise of ordinary care, should have known, of the danger. Five other drivers of automobiles had run down this bank and had wrecks at the same place. It was night and the place was dark when the wreck occurred, and defendant had no light there, so that the traveler on the highway could see the pitfall, and death was the result.