SYLVESTER *v.* GRAND RAPIDS BOOKCASE CO.

1. NEGLIGENCE—LICENSES—EASEMENTS—RAILROADS.

In trespass on the case for the killing of a cow that strayed through gates maintained by defendant corporation under a license from the railroad company, and was struck by a train after going on the railroad company's tracks, evidence that the public habitually used the gates, that defendant's officers had notice of the use and made no objection, posted no signs, and placed no lock or closing device on the gates, which were frequently left open, furnishes ground for a fair inference that defendant authorized the general use of the gates, and the public in so passing through was not committing a trespass.

2. SAME—STATION GROUNDS—WORDS AND PHRASES.

The gates, being located opposite defendant's property, were not on the station grounds of said railroad corporation.

3. SAME.

Under a written license to construct and use such gates on condition that the licensee assumed all risk of any liability for loss or injury occurring by reason of their use, whether caused by negligence of the railroad or not, defendant assumed the statutory liability of the railroad company.

4. SAME.

Plaintiff's contributory negligence did not bar his recovery under the statute. 2 Comp. Laws, § 6294; Act No. 308, Pub. Acts 1909.

Error to Barry; Smith, J. Submitted November 14, 1911. (Docket No. 97.) Decided March 29, 1912.

Case in justice's court by Frank Sylvester against the Grand Rapids Bookcase Company for the negligent killing of a cow. From a judgment for plaintiff, defendant appealed to the circuit court. Judgment for plaintiff. Defendant brings error. Affirmed.

*Lee H. Pryor,* for appellant.

*Thomas Sullivan,* for appellee.

Blair, J. The defendant is a Michigan corporation engaged in the manufacture of furniture in the city of Hastings, and employs about 175 men. It owns and occupies several lots in the city of Hastings extending from Market street on the east to Benton street on the west, and from State street, which is the main street of the city of Hastings, on the south, north to the Thornapple river. A short distance north of the factory buildings, the Grand Rapids division of the Michigan Central Railroad runs east and west by the plant. The main track is fenced on either side from Market street west with a wire fence. Between the main track and the factory buildings there is a long uninclosed side track extending from Market street west beyond the defendant's property. There are also two uninclosed side tracks extending around the factory on the south side. In 1906, the defendant company, with the consent of the Michigan Central, placed a gate in either side of the railroad fence about midway of their property, in order to reach their property on the north side of the railroad right of way; they owning about three-fourths of an acre north of the railroad tracks. These gates are about $4\frac{1}{2}$ feet wide and were not built for the use of vehicles or anything of that kind. On the south side of State street, and directly opposite the property of the defendant, is located the fair grounds, owned by the Barry County Agricultural Society. In October, 1909, plaintiff, who had leased these fair grounds, was pasturing his cattle upon them. Some time during the night of Sunday, October 18, 1909, plaintiff's cow escaped through an open gate from the fair grounds, which was about 40 or 60 rods from the property of defendant, passed down State street onto the property of defendant, and across to the railroad track. Here she passed through the south gate and entered upon the railroad right of way, where she was killed by a Michigan Central train some time before 6 o'clock on Monday morning. There is no testimony as to how the gate came open onto the railroad track or by whom either of the gates was opened. Plaintiff brought

suit in justice's court against the defendant company for the value of the cow, and the case was taken to the circuit court by general appeal, resulting in a verdict and judgment for plaintiff. The principal question for our consideration is whether there was any evidence of negligence on the part of the defendant.

Defendant acquired the right to put in the gates and use the crossing through a contract with the railroad company, whereby defendant agreed:

"That it will and hereby does assume all risk of and liability for any loss, injury or damage to persons or property that may occur from, in, through, by or in connection with the use of said crossing, whether the same be caused by negligence of the first party or otherwise; it being the intention of the parties hereto that the second party shall and hereby does assume all liabilities for any and all loss, injury or damage of every kind whatsoever that may occur where it shall appear that same would not have occurred but for the fact of the premises hereby granted to use said right of way in the manner aforesaid."

Certain railroad section men testified that in going over their section they found the gates open twice a week and closed them, and that this had frequently occurred when the factory was in operation.

John Eddy, a witness for defendant, testifies:

"I am an employé of the Grand Rapids Bookcase Company. My work in the factory is right in front of the gate in question. I have received instructions from the manager of the company to see that the gate was closed, and whenever I found it open to close it. I have performed that duty. That gate has been frequently opened by people in connection with the factory who have passed through it, and on those occasions when it has been left open I have closed it.

"Q. To your best knowledge has that gate ever been left open for any considerable length of time?

"A. Why, I could not tell exactly how long. I have closed the gates at night and in the morning when I have found it open, and that has been quite often. When the factory would close at night I would close the gate. I have noticed cattle pasturing on the fair grounds and

know of their getting out frequently. * * * I am instructed to watch the gate. There are a good many people using it, but I could not name them. The gate is used by factory men but very little, but they do use it some. It was put in a year ago last summer.

"*Q*. How many of the employés in a day would use these gates?

"*A*. Not any during the day, very seldom. They use the gates when they are going down the river, or anything like that, they went through this gate. * * * The majority of the people going through the gates come from towards town. I have spoken to Mr. Stem about people using the gates, but do not remember that I spoke of it before the cow was killed. I have noticed different times that it was impossible to keep the gate closed. Some one would leave it open as fast as I closed it. It is not a fact that the gate was open more than half the time. There is a clubhouse north of the track which was there at the time the cow was killed. I am a member of that club, and so is Mr. Stem. * * * There is a dozen or 15 people, I guess, belongs to the club. Those people used these gates going back and forth through there. I don't know whether that is done with the consent of Mr. Stem. He never told me to refuse these people the right to use that gate. I suppose he knew they were using it right along."

Charles Potts, a witness for defendant, testified:

"I am in the employ of the Grand Rapids Bookcase Company. I have seen cattle get out of the fair grounds, and they would go through the gate, and I have driven them back."

Mr. Stem, the secretary and treasurer of defendant, testified:

"I have seen cattle coming out of the fair grounds frequently and have taken steps to drive them back, particularly my own cow. She got out quite frequently. It has been a frequent occurrence for Mr. Sylvester's cattle to get out of the fair grounds, and it has been because of the gates being left open. * * * I have instructed a number of the workmen in relation to keeping these gates closed. I recall instructing Mr. Sharphorn, who is employed there, also Mr. Eddy and Mr. Stowell. I know I

instructed the boys when the gates were put in there to see that the gates were closed. Mr. Eddy worked the nearest to the gate of any of the employés and is approximately 24 feet away. The Bookcase Company owns three-fourths of an acre of land north of the railroad track. It is a very frequent thing for people of the city to go down river by boat evenings and Sundays. In doing so they naturally pass through these gates. * * * This land north of the railroad is leased to a clubhouse. And previous to that time the members of the company kept their boats on their own ground on the north side of the track, their own private boats. There was no clubhouse there. I leased the ground for the purpose of a clubhouse, representing the company. I kept a boat there myself and one other member of the company. Mr. Arthur Barber kept a boat over there, and then Mr. Potts has kept a boat over there—a partnership boat. * * * The gates were put in so that we could have access to our property on the opposite side of the track. We had holes cut in the fence, but we tore our garments. It was very inconvenient when they wanted to take ladies through there to go on the river. The railroad company have repaired these holes. The company afterwards called upon us, and we entered into that agreement, which is the only agreement had with the company. * * * I have seen the general public go back and forth across our premises to these gates many times, also go down the track. I have seen these gates left open every few days and have closed them myself on several occasions."

John Mead, a witness for the defendant, testified:

"I am employed by the Grand Rapids Bookcase Company. I first worked where that plant is now located, about 18 years ago, when the Hastings Furniture Company was there. At that time a family by the name of Rose was living north of the track. The oilhouse of the factory was located north of the Michigan Central. There was a toilet room north of the track. The public at that time went there frequently, across the railroad track. I have worked there more or less since that time and have noticed the same thing continually, down to the present time. On Sundays there are a good many people cross there to use the river for boating and other purposes."

Frank Nash, a witness for defendant, testified:

"In 1889 I worked in the manufacturing plant called the Hastings Furniture Factory, located where the Grand Rapids Bookcase Company now is. At that time there was a family by the name of Rose lived north of the railroad track north of the factory. The factory also kept their oil tanks and toilet room across the track. There was almost a public thoroughfare across the track, especially on Sundays. I am familiar with the premises at the present time. I do not believe that there is a Sunday but what there would be from 25 and may be 50 people or more people go down the river. The public crossed there in large numbers."

The court did not err in refusing to direct a verdict for defendant. It is clear from the testimony of defendant's own witnesses that it knew that these private gates were habitually used by the general public, and particularly in the evening after the factory had shut down, and on Sundays. So far as this record discloses, defendant took no steps whatever to prevent such public use, either by the posting of notice, forbidding the people seen using them, locking the gate after hours, or providing an automatic closing device.

While defendant's employés occasionally deposited waste finishing material upon the land north of the track, this land was leased to the boat club, and its primary use was for the benefit of the club members. The defendant used no care whatever to prevent the use of the gate nights and Sundays, having notice through the actual knowledge of its officers and employés that cattle were likely to escape from the fair grounds and go upon the tracks. One of the reasons for putting in the gates was to prevent ladies tearing their dresses, as had theretofore happened when using the gaps unlawfully made in the fence, and apparently the defendant encouraged the use of the gates by the general public. Although Mr. Stem had seen "the general public go back and forth across our premises to these gates many times," he said nothing to them and took no steps to prevent such use, so far as this record discloses.

It is not correct to speak of persons other than defendant's employés using these gates as "trespassers." It is a fair inference that the members of the boat club were authorized by defendant to use them, and that the general public had an implied license to use them, and whether the gates were left open by employés or licensees was immaterial.

The court properly instructed the jury that the gates were not within the railroad's station grounds. *Stewart v. Railroad Co.*, 147 Mich. 48 (110 N. W. 126).

The gates having been put in by the defendant for the sole benefit of the defendant under a revocable license from the railway company "to construct, maintain and use a temporary crossing," and having assumed "all risk of and liability for any loss, injury or damage to persons or property" in connection with such use, and having assumed full control of the crossing gates, it thereby assumed as to third persons the statutory liability of the railway company, and the contributory negligence of the plaintiff would not bar his right of action. *Neversorry v. Railway Co.*, 115 Mich. 146 (73 N. W. 125).

We find no prejudicial errors in the charge of the court, and the judgment is affirmed.

STEERE, McALVAY, STONE, and OSTRANDER, JJ., concurred.