### KEISWETTER *v.* RUBENSTEIN.

1. Negligence—Personal Injuries—Employee of Subcontractor Entitled to Recover From Owners.

   In an action against the owners by an employee of a plumbing company, which had the contract for the plumbing work in a house under construction, for personal injuries inflicted upon him by the collapse of the house while he was lawfully upon the premises engaged in laying out his work, after being notified by the owner in charge of the work that the building was ready, his rights are not affected by the fact that his employer was a subcontractor on the job.[1]

2. Contracts—Construction For Court Where No Ambiguity—Independent Contractor—Joint Adventures.

   Where there was no ambiguity in the contract under which defendants agreed to combine in a co-operative undertaking to improve and dispose of property owned by one of them for their mutual profit, there was no reason for submitting it to the jury, particularly upon the question of whether the defendant in charge of the work was an independent contractor.[2]

3. Partnership — Not Necessary to Show Partner Obligated to Share in Losses.

   In actions by third parties against charged partnerships, it is not necessary to show that a claimed partner was obligated to share in the loss.[3]

4. Joint Adventures—Definition.

   A "joint adventure" is defined as an association of two or more persons to carry out a single business enterprise for profit.[4]

5. Same — Rights and Liabilities Tested by Same Rules as Partnerships.

   While, under the present state of the law, courts do not treat a joint adventure as in all respects identical with a partnership, the contractual relations of the parties and

---

[1]Negligence, 29 Cyc. p. 456; [2]Contracts, 13 C. J. § 996; [3]Partnership, 30 Cyc. p. 390; [4]Joint Adventures, 33 C. J. § 1,

nature of their associations are so similar and closely akin to a partnership that it is commonly held their rights and liabilities are to be tested by the same rules that govern partnerships.[5]

6. SAME—PARTIES ENGAGED IN JOINT ENTERPRISE—NEGLIGENCE OF ONE IMPUTED TO BOTH.

When two persons are engaged in the prosecution of a joint enterprise, each has authority to act for both in respect to the means or agencies employed to execute the common purpose, and the negligence of one in the management thereof will be imputed to both.[6]

Error to Wayne; Merriam (De Witt H.), J. Submitted June 12, 1925. (Docket No. 10.) Decided June 7, 1926.

Case by Joseph D. Keiswetter against Sam Rubenstein and Godfrey Hammel for personal injuries. Judgment for plaintiff. Defendant Hammel brings error. Affirmed.

*Payne & Payne (Thomas W. Payne,* of counsel), for appellant.

*Edmund M. Sloman,* for appellee.

STEERE, J. Plaintiff brought this action to recover damages from defendants for personal injuries inflicted on him by the collapsing of a small dwelling house in process of construction while he was at work in it as a plumber. The building fell without warning. Plaintiff was so caught and crushed by falling timbers as to suffer numerous broken bones. His injuries were serious and apparently permanent. He recovered a verdict and judgment against defendants in the circuit court of Wayne county for $6,000. Defendant Rubenstein took no appeal, but defendant Hammel has brought the case to this court by writ

[5]Joint Adventures, 33 C. J. § 2; [6]Id., 33 C. J. § 102 (Anno).

of error.    The extent of plaintiff's injuries or size of the verdict are not seriously questioned.

The issue urged here by Hammel is that he cannot be held liable jointly with Rubenstein for injuries sustained by plaintiff through Rubenstein's negligence, or that of other employees working on the job under him, as Rubenstein was an independent contractor constructing the building which fell; while plaintiff contends that as to him defendants were partners. The record shows that at the time of this accident defendants were interested together in building a number of small houses on some lots in Detroit owned by Hammel located on Hasse avenue in "Mackinac Park" of a described subdivision in the outskirts of Detroit.    Their building project was going forward at the time of the accident under a written memorandum of agreement between them dated May 1, 1923.    By that agreement Hammel as party of the first part is introductorily named as the owner in possession of some eleven described lots, upon each of which it is stated "he desires to erect a one-story 5-room and basement cottage, and to sell the same with said land for profit."    Defendant Rubenstein as party of the second part is described as a carpenter-contractor, experienced in constructing houses of the type mentioned.    Of their respective activities and obligations in connection with the proposed undertaking the contract specifies that Hammel shall provide the money or credit for carrying on the building enterprise, while Rubenstein shall devote his entire time to it, furnish plans, purchase the material, hire labor and superintend the work; and shall also "assist first party in the sale of the lot(s) after the completion of said dwellings."    The agreement further provides:

"First party shall receive all profits derived from the sale of said lots up to $500 per lot; if sufficient profits are derived, then said second party shall receive the second $500 or such part thereof as may

be derived, and all profits above one thousand dollars shall be divided equally between said parties.

"Profits above mentioned shall consist of the difference between the cost of said land and dwellings and the net proceeds and sale, cost of building shall take into account office printing and other incidental expenditures, and the cost of the land shall be taken as $850 per lot plus general and special taxes. Both parties shall receive $50 per week during the time construction work is proceeding. All accounts should be kept by first party, open to inspection by second party at any reasonable time."

The contract concludes with a statement that Hammel also owns an equity in eleven other lots in Mackinac Park subdivision, and the remote contingency that:

"If upon completion of the first eleven lots first party is able to finance the erection of eleven additional dwellings upon the last mentioned lots second party is given the option and agrees to proceed with the erection of the additional dwellings upon the same terms as herein provided for the first eleven dwellings."

The agreement is silent as to when construction should begin or end, but it was commenced that spring with Rubenstein in charge and when plaintiff was injured, on June 7, 1923, he was erecting the fifth cottage, which fell because of an absence of braces. The chief building inspector of the city testified that lack of bracing and the weight of men working on the roof and upon a scaffold outside caused it to collapse. He said that "Mr. Rubenstein, the man on the job, after a good deal of questioning admitted he had the labor contract." He also produced the building permit taken out by Hammel as owner.

Plaintiff was a plumber employed by Steiner & Company, a plumbing and heating company which had a contract to do the plumbing work on these cottages. He testified that he had done the rough plumbing on

the first four buildings, and, after finishing the fourth, began work on the fifth after Rubenstein told him it was ready.    He had been in the building but a short time and was laying out his work where the fixtures would be in the bath room when, without any warning, the building suddenly collapsed and he was caught under the falling timbers.    As negligence in not properly bracing the building at that stage of its construction while men were working upon and in it is not questioned, nor the extent of plaintiff's injuries, the testimony upon both those subjects expert and otherwise is omitted.

It is undisputed that Rubenstein was in direct charge of this construction, hired and discharged the employees, looked after procuring the material, and in general took and exercised on the premises the visible functions of a building contractor.    He first procured plans of the proposed cottages, which were approved by Hammel who, however, held the purse strings and personally paid all bills, including $50 per week to Rubenstein and wages of the workmen according to the pay rolls Rubenstein turned over to him.    He also drew from or charged to the building account his $50 per week provided for in the agreement as well as office expenses, interest, insurance, mortgage expenses, legal expenses, commission, etc., aggregating over $5,000.    Hammel's business was that of a public accountant, at which he was employed while this work was going on.    He had no experience in building, said he knew nothing about it, and did not assume to interfere with Rubenstein's building operations. He visited the place from time to time and conferred with Rubenstein, the last occasion being on the Saturday before the accident.    Rubenstein's version of the general conduct of the work is as follows:

"Mr. Hammel paid for the materials which went into the buildings.    I ordered some of the materials

and Hammel ordered some. We talked together regarding the ordering of the material:

"*Q.* Did you discuss with Mr. Hammel who contracts were to be given to?

"*A.* No, sir. I ordered just wood, lumber. It was billed to Mr. Hammel and Rubenstein. Mr. Hammel ordered all the rest. Mr. Hammel came around the job sometimes every day, sometimes twice a week—just looked around. He talked with me about the buildings and about the work. I ordered the plans and there were no changes. They were made before the contract was entered into. Mr. Hammel paid for the plans. There was no architect. I gave all my time while the buildings were being put up to that work and did not work on any building for anybody else."

In reply to this Hammel denied ordering any of the material or letting any of the subcontracts, but said Rubenstein reported them to him, he kept track of the accounts and paid them for his own protection. He admits requesting Rubenstein to let the plumbing contract to Steiner & Company for whom he had done some auditing work, provided their bid was as cheap as any one else's.

Plaintiff testified that he knew Hammel, who had told him he owned the lots upon which those buildings were being erected, and thought he last saw him around the property the Saturday before the accident. Rubenstein had no control over him in his work there except to tell him when the building was ready for him. He was working for and paid by Steiner & Company who sent him there to do work required by their contract. Under those circumstances plaintiff was lawfully upon the premises as a workman aiding in the construction of the building and in the line of his duties directed by Rubenstein to the place where he was working when injured. His rights in this litigation are not affected by the fact that his employer was a subcontractor on the job.

Appellant's basic assignment of error urged by his counsel is refusal of the court to direct a verdict in his behalf on the ground that, as shown by the written agreement between defendants and the undisputed testimony, Rubenstein was an independent contractor, for whose tort in the performance of his contract Hammel was not legally liable.    The trial court was of opinion that the written agreement between defendants was ambiguous and submitted it to the jury to determine from the evidence "what the intent of the parties was in entering into the contract that they did," instructing them that when passing upon the contract they could consider the parol evidence in determining whether defendants were partners, or whether Rubenstein was constructing those houses as an independent contractor, of which the court said:

"An independent contractor is one who carries on an independent business, contracts to do a piece of work according to his own methods, and without being subject to the control of his employer, as to the means by which the result is to be accomplished but not as to the result of the work.    The test of this relationship, members of the jury, is as to whether or not Mr. Hammel had control over Mr. Rubenstein in the construction of these houses, as I shall define the word 'control' to you.

"Now, if Mr. Hammel in this contract reserves to himself the right of supervision over the work in question, not as to how the work was done, but the right of supervision to see that the contract was done and that the work was completed, then, members of the jury, that would not be such a supervision as would constitute a partnership between these two men."

Turning to the written contract between these parties under which they agreed to combine in a cooperative undertaking to improve and dispose of the property involved for their mutual profit, considered as an entirety, we fail to find in it any ambiguity requiring its construction to be submitted to a jury,

particularly upon the question of whether defendant Rubenstein was an independent contractor.    While he agreed to contribute to this common enterprise his time, knowledge and experience as a builder of houses, a part of the project in which Hammel was totally inexperienced, that contract nowhere specifies that he shall be in absolute control, even in the part of their undertaking he was to superintend and manage.    His agreement to provide the plans, purchase the material, hire the labor, superintend the work and assist Hammel in the sale of the lots was not as an independent contractor, but to be done by him in performance of his part of their mutual project for ultimate profits when the property was sold.    He was not required to pay for any labor or material, no time of performance was specified nor was any price fixed for what he was to do beyond his anticipated share in the profits, except that he and Hammel were to each draw $50 per week from the fund devoted to their common enterprise while the work was in progress.    On his part Hammel was to furnish the land, pay all bills for labor, material and other incidental expenses, and do the office work, including the bookkeeping, "all accounts to be open to inspection by said second party at any reasonable time."    The provisions of this written agreement comprehensively viewed, and their own interpretation of it in performance, so far as shown, is persuasive that its execution as a whole was under their joint control with, if either, Hammel, who owned the property and supplied the money to carry out their project, most dominant.

The question of whether or not defendants were partners is a more subtle one, to which the briefs of counsel are largely devoted.    Both sides are able to cite authorities tending to sustain their respective contentions on that proposition, most of them however relating to *ex contractu* actions by third parties claim-

ing to have dealt with the denied partnerships as such.

The technical question of what constitutes a partnership and how to define it is one upon which textwriters and courts of last resort are more or less at variance.     It has been stated that:

"The difficulty of formulating a definition of a partnership, at once accurate, comprehensive and exclusive, is said to be insuperable."     20 R. C. L. p. 800.

See, also, 1 Rowley's Modern Law of Partnership, § 368.

Judge Lindley states in the introductory chapter of his well known work on Partnership (2d Am. Ed.), 1:

"To frame a definition of any legal terms which shall be both positively and negatively accurate is possible only to those who, having legislative authority, can adapt the law to their own definition."

The author then gives a series of varying definitions taken from works of celebrity, of which probably the best known and most commonly accepted in this country is the following by Chancellor Kent:

"Partnership is a contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business, and to divide the profit and bear the loss in certain proportions."     3 Kent's Comm. 23.

But this definition has been criticized and varied from by courts and text-writers as either too comprehensive or too exclusive.     The Supreme Court of the United States has eliminated from that definition proportionate loss and said:

"The requisites of a partnership are that the parties must have joined together to carry on a trade or adventure for their common profit, each contributing property or services, and having a community of interest in the profits.     *Ward* v. *Thompson*, 22 How. 330, 334."     *Meehan* v. *Valentine*, 145 U. S. 611 (12 Sup. Ct. 972).

While an apparent statement of a general definition, that case was an action of assumpsit by a third party against an alleged partnership. Here the agreement between defendants contains no provision that Rubenstein shall participate in any losses. This court has held in actions by third parties against charged partnerships that it is not necessary to show a claimed partner was obligated to share in the loss. *Dutcher* v. *Buck,* 96 Mich. 160 (20 L. R. A. 776). We do not, however, find it necessary to follow that question further into its puzzling deviations as to intent and other tests, for it is clearly and conclusively shown here that these defendants intentionally associated themselves together in a written contract for the express purpose of combining in a joint adventure, or single business enterprise for profit, one contributing his time and skill and the other the property and money required to carry it out.

A "joint adventure" is defined as "an association of two or more persons to carry out a single business enterprise for profit." *Fletcher* v. *Fletcher,* 206 Mich. 153. See, also, *Alderton* v. *Williams,* 139 Mich. 296. While, under the present state of the law, courts do not treat a joint adventure as in all respects identical with a partnership, the contractual relations of the parties and nature of their association are so similar and closely akin to a partnership that it is commonly held their rights and liabilities are to be tested by the same rules that govern partnerships.

By the same token it is claimed Rubenstein was in sole control of construction, Hammel was in sole control of their accounts and the money essential to finance the enterprise, of which he never let Rubenstein handle a dollar except his weekly stipend, but whatever either was exclusively authorized to do under their agreement, or did, each was acting for both in furtherance of their joint adventure, or enterprise for their mutual

profit. In *Kokesh* v. *Price,* 136 Minn. 304 (161 N. W. 715, 23 A. L. R. 643), the rule is stated as follows:

"When two persons are engaged in the prosecution of a joint enterprise, each has authority to act for both in respect to the means or agencies employed to execute the common purpose, and the negligence of one in the management thereof will be imputed to both."

Hammel owned the premises where the accident occurred and the buildings being erected upon them. He so told plaintiff when he saw him there and was to a degree personally instrumental in his being there in the particular that the contract of plumbing was let to plaintiff's employer at his instance. Under the written agreement and undisputed facts shown in this case the negligence of Rubenstein within the scope of carrying out their joint enterprise was also imputable to Hammel.

To the extent construction of this agreement was left to the jury, they arrived at a right result. Rubenstein's negligence being held imputable to Hammel, and no question raised as to Rubenstein's negligence or the amount of the verdict, the judgment will stand affirmed.

BIRD, C. J., and SHARPE, FELLOWS, WIEST, and MCDONALD, JJ., concurred. CLARK, J., did not sit.

Justice MOORE took no part in this decision.