LYSHAK v. CITY OF DETROIT.

1. TRESPASS—CONSTANT PRESENCE OF TRESPASSERS KNOWN TO POSSESSOR OF LAND.

A possessor of land who knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area thereof, is subject to liability for bodily harm there caused to them by his failure to use due care while engaged in carrying on an activity involving a risk of death or serious bodily harm.

2. NEGLIGENCE—EMPLOYEE—INJURY TO KNOWN TRESPASSING MINOR.

Defendant city, as owner of golf course upon which plaintiff, a 7-year-old boy, was seen in the company of others trespassing on fairway by foursome of golfers, when defendant's employee, one of the foursome, teed off a golf ball which thereupon put out an eye of plaintiff would be liable for negligence of such employee, such negligence being a question for the jury.

Appeal from Wayne; Maher (Thomas F.), J. Submitted April 4, 1957. (Docket Nos. 27, 28. Calendar Nos. 46,949, 46,950.) Decided March 4, 1957. Rehearing denied April 14, 1958.

Case by William Peter Lyshak, an infant, by Peter Paul Lyshak, his guardian, against the City of Detroit, Richard Clyde Hayman, John Dalrymple, Stanley Jawar and Louis E. Powers for personal injuries, specifically the loss of an eye, sustained when struck by golf ball while trespassing on municipal golf course. Similar action by Peter Paul Lyshak for medical expense. Cases consolidated for trial and appeal. Verdict only against municipality. Judgment *non obstante veredicto* for defendant City of Detroit. Plaintiffs appeal. Reversed and remanded for entry of judgment on verdict.

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 38 Am Jur, Negligence § 112.
[2] 38 Am Jur, Negligence § 356.

*Walter Lyshak* (*Jacob A. Tolonen,* of counsel), for plaintiffs.

*Paul T. Dwyer,* Corporation Counsel, *Leo E. LaJoie* and *Alfred Sawaya,* Assistants Corporation Counsel, for defendant.

*Nathaniel H. Goldstick,* Corporation Counsel, and *Robert D. McClear* and *Alfred Sawaya,* Assistants Corporation Counsel, for defendant on application for rehearing.

SMITH, J. Here we consider the case of a small boy whose eye was put out when he was struck by a golf ball as he played, with other boys, on the Redford golf course. He was 7 years old at the time, in the second grade at school. He, by his father, is the plaintiff in one case, and his father is plaintiff in the other. (The cases were consolidated for trial.) We will, for purposes of simplicity, use the term plaintiff in the singular in most places in the opinion. The city of Detroit was one of the defendants and is the sole appellee.

The plaintiffs, joining as defendants 3 of the "foursome" playing the thirteenth hole (one of whom had driven the ball which blinded the infant plaintiff), the city of Detroit, and one Louis E. Powers, claimed a joint and several liability arising out of an alleged agency relationship and concurrent negligence. The status of Powers should be explained. He, by assignment, and the city, had entered into a contract for the operation of what the agreement terms a "concession." Powers was to provide golf instruction and sell golf merchandise and accessories at the Detroit golf courses. The city was to get a percentage of the gross receipts. Defendant Dalrymple was Powers' assistant for this purpose at

the Redford course, defendant Jawar his assistant at the Rouge course, and others performed similar services elsewhere. Both Dalrymple and Jawar were members of the "foursome" above described and were joined as defendants.

At the close of plaintiff's proofs the trial court granted defendants' motion for directed verdicts as to 2 of the players, defendants Jawar, Dalrymple, and as to defendant Powers, from which decision no appeal was taken. After all proofs were in the jury returned a verdict of no cause for action in favor of defendant Hayman (the other player of the foursome), and awarded damages to the infant plaintiff in the sum of $50,000 and to his father in the sum of $3,000, both against the city of Detroit. The trial court thereafter granted defendant city's motion for judgment *non obstante veredicto* as against both plaintiffs, from which judgment entered plaintiffs have taken a general appeal.

The main thrust of plaintiff's argument on appeal is devoted to the proposition that defendant city knew that children "were constantly coming onto the golf course during the summer months, just as they had been doing for over a long period of time." From this knowledge, says plaintiff, there arose "a duty on the part of defendant city of Detroit to keep a lookout for such children who might be on the golf course and, in the exercise of ordinary care, to discover their presence and the presence of infant plaintiff in a dangerous situation as presented itself on the day infant plaintiff was injured and exposed to the danger and peril of being struck by a flying golf ball." Plaintiff's conclusion is that the city breached this duty of care owed plaintiff, and, hence, must respond in damages for injuries proximately caused thereby. The city counters with the primary assertion that "there most certainly can be no negligence where there is no

duty," and that defendant city was under no obligation to trespassers or licensee to keep its premises safe for the use of children as a playground.

It is very disturbing to the peace of mind of appellate judges to read many cases. Indeed, it is often disturbing to read what the appellee has to say about a case that seemed so clear, so lacking in complexities, from the appellant's statement. And so it is here. This case, we are told, concerns merely a trespassing child. And, as all know, a trespasser has no rights. A licensee has a few, and an invitee more, but as to a mere trespasser there is no duty of care. There being no duty there can be no negligence, and there being no negligence there can be no recovery by a trespassing child, though grievously hurt.

And yet, if a defendant baits traps with stinking meat and thus lures a trespassing dog to destruction, the defendant has been held liable (*Townsend* v. *Wathen*, 9 East 277 [103 Eng Rep 579]). There seems to be here a valid (and perplexing) analogy. The theory is that one is liable if he lures something to its destruction. In the case before us, a great city maintained, in a densely populated residential section, a park-like area, a golf course, with ample lawn, trees, and "a little creek." Upon this area, in the summer, children entered daily. They were drawn to it for purposes of play as naturally as the dog to the bait. The city of Detroit knew this, knowing it the only way a "city" can know anything, through the knowledge of its employees, servants, and agents. The professional at Redford knew it. The supervising greenskeeper, who had charge of all men working on the golf course, and the repair and control of the fence, knew it. The official in charge of the Redford course knew it. However, knowing of the daily entrance of children onto the course, for purposes of childish play, the

city, it is asserted, nevertheless continued to conduct thereon an enterprise of such character as to subject these children to risk of grave bodily injury, resulting in infant plaintiff's loss of one eye.

We will assume that the infant plaintiff, like the dog, was a trespasser. The dog's owner, nevertheless, recovered for his loss. The boy, according to the trial court, is to get nothing. What kind of law is this? Is there a real difference in the cases? In the trespassing dog case Lord Ellenborough, C.J., said (pp 280, 281) that the defendant (who had baited the trap) must be considered as having contemplated the probable consequences of his act, that he had influenced "the instinct of those animals" and had, in effect, drawn them "irresistibly to their destruction." In fact, said the Chief Justice, the dog "might scent the bait, without committing any trespass," so near was it placed to where the dog had a right to be without committing any trespass whatsoever. It takes great legal skill to distinguish the trespassing boy, having viewed the allurements of the park-like area across the crowded city street, where he had the right to be, from the trespassing dog that followed his instincts to his destruction, denying recovery to the trespassing boy, but granting it to the owner of the trespassing dog. We are not sure we possess the skill required.

We would be the last to deny, however, that there are real differences in the 2 cases. Thus the child has responsible parents. They have, as we pointed out in denying recovery to a trespassing child in *Ryan* v. *Towar,* 128 Mich 463, 479 (55 LRA 310, 92 Am St Rep 481), both a natural and a legal "duty of care and watchfulness," and it is often because of a parental lack of care that the trespassing child is injured. In other words, the parents must keep the children in. It is not up to the adjoining landowner to keep them out. But again the reported

cases disturb our complacency, the logic of our reasoning. For this was also the common law with respect to trespassing cattle. Yet in 1848, the supreme court of Illinois (*Seeley* v. *Peters,* 10 Ill. [5 Gilm] 130) reversed the common-law precedent. It thus became a landowner's responsibility to keep trespassing cattle out. Why the change? The Court recognized that the environment for cattle had changed, hence, the rule as to their trespasses should also change. "Cows on treeless and sparsely-settled prairies required," it was reasoned, "different treatment from that given to cows in suburban  *  *  * communities." (Seavey, Cogitations on Torts, 37; 19 NACCA LJ, 278.) Do children, likewise, in the densely populated and industrialized areas of today, utilizing as their "playgrounds," city streets, piles of lumber, steel I-beams, vacant lots, even golf courses, require different treatment (meaning that as to them a landowner must exercise reasonable care) from the children of our frontier communities, even from the children of feudal times? This, simply stated, is our problem.

The issue relating, then, to an alleged trespass, we will consider in some detail the established facts bearing upon this point.

The record shows that the city of Detroit owns and operates the Redford golf course, where this accident occurred. It had, the city concedes, "been open during the winter months for winter sports," at which time children were permitted to enter for the purpose of play upon the skating rink and toboggan slide provided for their use. There would be "maybe three or four hundred at a time tobogganing and sledding." Infant plaintiff himself was often among this number and his usual method of gaining entrance to what was at this season of the year a playground was to crawl "under these holes" in the fence, rather than going around to the admission

gate. (One witness testified that "there were close
to 30 holes around the entire golf course through
which children could get onto the golf course. The
largest hole is about 4 feet by 6 feet." In addition,
near the thirteenth fairway, "We have a ditch run-
ning through, and, of course, when there is not water
in there, it is quite a hole." Finally, as another wit-
ness testified, "There was a gate back of the house
and it had a chain on it but the chain came back far
enough so you could walk right in.") At the con-
clusion of the winter sports, however (the precise
date not appearing in the record), entrance was
forbidden since the game of golf was there to be
played. That which had theretofore been a place
of safety and play became a place of danger. The
playground had become a trap, the familiar area
still inviting in appearance, but now involving hazard
to those who had formerly played there. The city,
of course, was aware of this. Signs were posted
"as early as the month of April of each year," from
24 to 30 in number, containing warnings: "The
city will not be responsible for injuries sustained."
"For players only." "Danger, golf course, for
players only." In addition, it is claimed (and denied)
that children were actually evicted from the golf
course upon being found there. The record states
that the services of "rangers" were utilized. These
men, it was testified, "were the people working in
the clubhouse too. * * * I mean the same people
that served drinks and waited on the public." Dur-
ing the time "when they weren't busy, they went
out on the course." It did not purport to be a con-
stant patrol, testified Mr. Sweeney, the superin-
tendent of public service for the city of Detroit,
under whose jurisdiction comes "all revenue pro-
ducing in the parks and recreation." As he put
it, "We do not have rangers there all the time. We
spot check. The ranger has various duties." One

witness testified that he had seen rangers direct children off the course "many times," another that he saw children on the golf course "just about every day. in the week," that he never saw "anyone chase the children off the golf course." When asked as to rangers, "who would patrol the golf course to put the children off," he answered "I don't know definitely, but I have heard that they did." This witness had worked at the Redford course as a caddy, 6 days a week, from 1950 to 1952. "The average time I spent on the golf course," he testified, "amounted to 57 hours per week and during this entire period of time that I spent on the golf course I never saw a ranger there. I do not know what type of uniform or insignia a ranger would wear." It was also testified that the laborers were instructed "to eject boys or anybody that is undesirable from the course" as incidental to their "main job" of taking care of the golf course.

Regardless, however, of how efficient the so-called rangers were in their duties of eviction, if, in fact, performed at all, there was testimony from which the jury could well find that children were constantly coming onto the golf course, to the knowledge of responsible employees of the city. "There is not a day goes by but that boys don't either burrow under the fence or climb over the top" testified one of the city's witnesses. It was a matter of common knowledge to him, he said. Another (Mr. Walker, senior public service attendant, in charge of the Redford golf course) when asked if "you yourself and most of the employees on the golf course knew that children were getting on that golf course?" answered "Sure." They were there (according to a witness for plaintiff) "just about every day of the week" and the witness never saw "anyone chase the children off the golf course." As a matter of fact the city's answer admits that

"children often do get onto the Redford golf course by climbing over or under the fences surrounding the course, but such trespassing is without the consent of the persons in charge of the course."

It is clear that the plaintiff himself was not on the golf course as a matter of right. He was in the company of some older boys who were flying model airplanes. He entered, as we noted, by crawling through a hole under the fence. This was his customary entrance, even in the winter when the golf course was used as a playground for children. "When I crawled under the fence, I did not know that I should not have gone on the golf course. I did not know then why there was a fence there." His action, it is clear also, was in violation of the warning signs we have heretofore described. What is not clear on the record, however, is whether such signs (*e.g.,* "The city will not be responsible for injuries sustained") were within the normal scope of comprehension of a child in the second grade at school. Our recollection of the second grade is so obscured by the mists of time that even the broad outlines are lost and we cannot take judicial notice (even if such were permissible) of the fact. Decision, however, will not turn on this point. The lower court rested it on the holding that the boy was an out-and-out trespasser. The defendant city, in fact, states that such is the only question before us on appeal. Let us concede, then, only for the purpose of this analysis, that the city is right, that there is no element of invitation in the circumstances, and that the unquestioned winter license to play had been effectively revoked. Does it follow that the boy's eye can be put out with impunity, so far as the payment of damages is concerned? Get the question squarely before us: We are conceding that this second grader violated the property rights of the city of Detroit, its exclusive right of possession.

Is this *jus excludendi,* this *jus utendi,* so sacred that its violation even by the feet of a playful child makes him an outlaw, beyond the pale of protection normally accorded those who have been hurt by the carelessness of others?

In order completely to understand the case before us it is necessary that it be viewed in its historical perspective. It involves one of the great battle-fields of our modern law, an area in which daily skirmishes are conducted, this case merely adding another to the long series. Arrayed against each other are 2 mighty forces: The sanctity of land ownership versus the duty of care.

We accept as commonplace today the principle that there is a duty upon all men so to conduct their activities as to minimize the likelihood of harm to others. "Negligence, as I understand it," stated Chief Justice COOLEY in *Detroit & Milwaukee R. Co.* v. *Van Steinburg,* 17 Mich 99, 118, 119, "consists in a want of that reasonable care which would be exercised by a person of ordinary prudence under all the existing circumstances, in view of the probable danger of injury." The probable danger of injury to children playing on a golf course requires no elaboration. A powerfully-driven golf ball in flight is a projectile of lethal qualities, as this record amply demonstrates. It has been held (*Brooks* v. *Bass* [La App, 1938], 184 So 222, 225) that

"The ball driven with force by a golf stick in the hands of a player travels through the air with great velocity and in such case it becomes a dangerous instrumentality with respect to any person who might be within or near its line of flight. It must also be considered that a driven golf ball does not always follow the line of aim intended by the golf player and that even those who are expert at the game do not always attain perfection in their shots."

The difference between a golf course and a rifle range, then, as a playground for children, is a difference of degree only.

If duty is born of danger, the duty of the city of Detroit, knowing that children frequent a certain area, is clear. But at this point another factor comes into operation: the sanctity of land ownership. As Bohlen puts it (Studies in the Law of Torts, p 46) in speaking of the English cases dealing with the rights of owners of real estate, "perhaps no higher form of privilege is known to the law than that of an owner to devote his land to what uses he sees fit, so long as he confined the effects of his user to his own land." The doctrine was an outgrowth of feudal society, as natural to such society as zoning to an industrial complex. In such an era it was unthinkable that a mere trespasser, a poacher indeed, should have any rights. Under the ancient forest laws, in fact, the killing of the king's deer "was equally penal with murdering one of his subjects." (See Game Laws, Jacob's Law Dictionary, 1797.) Eldredge (Tort Liability to Trespassers, 12 Temple L Quart 32) well summarizes the philosophy of the times:

"In feudal England the emphasis was all on the side of the proprietors of landed estates. It was to be expected that in an age in which feudal lords were practical sovereigns they would not ordinarily be subject to liability for harm to persons on the land. Surely, if even the king could not enter without permission, there was some basis for the rule that the possessor of land had no duty to anticipate trespassing or guard against harm to trespassers. * * * Consequently the general rule was that there was no liability whatever upon the possessor for harm caused to infant or adult trespasser, or to trespassing animals, for harm received by them upon the land."

We need hardly elaborate upon the changes that have taken place since those times. A simple agrarian economy has been replaced by a crowded urban industrial society. The airliner furnishes daily and dramatic proof that the landowner no longer controls from his soil "up to the sky." *Cujus est solum, ejus est usque ad coelum.* The king's subjects, moreover, are no longer content to remain on a par with the king's deer. Yet infants still follow their childish instincts as naturally as the vagrant wind rustles the leaves of the trees. It is with respect to these children that we now ask this fundamental question: To what degree does the landowner still wear the feudal mantle of special privilege, exempting him from the ordinary rules of negligence when children (yes, trespassing children) are known to frequent land upon which he is carrying on an enterprise hazardous to them? Can he simply say, "They are trespassers" and continue as if they were not there? Can a landowner blindly throw the firing lever and explode blasting charges in a vacant lot that, to his knowledge, is used daily as a playground by (trespassing) neighborhood children? Or, paraphrasing Professor James in 63 Yale LJ, 144, 182, does a landowner's right of exclusive possession carry with it the privilege to engage in conduct fraught with unreasonable probability of harm to the lives and limbs of infants merely because there is no consent to their presence?

The early law we have seen. As the years have passed, however, the doctrine of the special immunity of landowners, particularly with respect to trespassing children, has been subjected to a persistent erosion. The courts have increasingly abandoned the position that: "There is no more lawless class than children, and none more annoyingly resent an attempt to prevent their trespasses," (*Ryan* v. *Towar* [1901], 128 Mich 463, 466 [55 LRA 310, 92

Am St Rep 481]), in favor of the position that,
"We are clothed with a trusteeship as to the care
for those of tender years," (*Johnson* v. *Wood* [1945],
155 Fla 753, 756 [21 So2d 353]). We now, in most
States, if not all, recognize that the rights of land-
owners are not absolute but are relative. Modern
law represents an adjustment of conflicting inter-
ests. The landowner's right of exclusive occupancy
is one factor. It is of great importance, both eco-
nomically and socially. But does this give him an
exemption from a citizen's ordinary duty to so con-
duct himself as not to subject others to unreasonable
risk of harm? We must weigh against the ancient
exclusive rights of the landowner the known fact
(among others) that although urban children live,
physically, in a world in which the stream of traffic
has replaced the stream of water, and concrete and
asphalt the pasture and meadow, mentally theirs
is still a world of fiction and fantasy. Theirs, we
know also, is a world in which property rights, ei-
ther personal or real, are obscure, and in which the
trespass is the norm. These things we cannot
change. They are existing facts, as concrete as the
playground itself, and the law must take them into
account. Thus it was that Mr. Chief Justice Cooley,
in an opinion (*Powers* v. *Harlow,* 53 Mich 507, 515
[51 Am Rep 154]) antedating by many years *Ryan*
v. *Towar, supra,* held that:

"Children, wherever they go, must be expected to
act upon childish instincts and impulses; and others
who are chargeable with a duty of care and caution
towards them must calculate upon this, and take
precautions accordingly. If they leave exposed
to the observation of children anything which would
be tempting to them, and which they in their im-
mature judgment might naturally suppose they were
at liberty to handle or play with, they should expect
that liberty to be taken."

It was because of such considerations that late in the last century we find such cases as *Railroad Company (Sioux City & Pacific R. Co.)* v. *Stout* (1873), 17 Wall (84 US) 657 (21 L ed 745), approving recovery of damages by a trespassing boy, 6 years of age. Here the court, in reaching decision, employed an orthodox negligence analysis, approving a charge to the jury (pp 659, 663) which comprehended the element of probability of trespass, *i.e.*, defendant's "reason to anticipate that children would be likely to resort to it." It necessarily approved also, the proposition that the defendant (p 661) "had omitted that care and attention to prevent the occurrence of accidents which prudent and careful men ordinarily bestow."

This decision, the famous "turntable case," has been both followed and rejected. As commonly happens in a transitional period, benevolent fictions are freely employed to accomplish a result in harmony with the changed social conditions, while preserving the language of the older cases. The fictions employed in the action of ejectment are classical examples. (Is this judicial "legislation"?) Thus, in some courts approving the result of the *Sioux City Case,* the trespassing child became an "invitee," to whom a duty of care was owed. (Maintenance of some dangerous object, highly attractive to children, was "tantamount," in the unreasoning mind of an infant, to an "invitation" to use it. See *Keffe* v. *Milwaukee & St. Paul R. Co.,* 21 Minn 207 [18 Am Rep 393]; 2 Harper & James, Law of Torts, § 27.5). Or, if the trespasses were sufficiently frequent and notorious, an implied "license" might be found. In fact it is urged upon us here that upon this record plaintiff was a licensee (33 Am Jur, License, § 92, p 400; *Sylvester* v. *Grand Rapids Bookcase Co.,* 169 Mich 340; *Polston* v. *S. S. Kresge Co.,* 324 Mich 575) and not a trespasser. There is, indeed, merit

to the claim, but our decision will not turn on it. We are reluctant, in an area involving rights so fundamental and vital, to rest decision upon what is actually a fiction, the "implied" license. The circumstances giving rise to the implication might better ground a realistic statement of the law. Fictions, of course, are not necessarily bad. The danger is that a court, after frequent repetition, will begin to believe they are real and thus, employing them, reach inequitable results. See use of fictions in *Courtney* v. *Apple,* 345 Mich 223, dissent, 237. And so in this field. If there is to be required an actual "invitation" to the child by some object attractive to children, and whatever did the inviting did not do the harm, the invitation was not proximate cause of the accident and there could be no recovery. See *United Zinc & Chemical Co.* v. *Britt,* 258 US 268 (42 S Ct 299, 66 L ed 615, 36 ALR 28). (So runs one of the city's arguments in the case before us: The green park may have attracted the infant, but it was a golf ball which hurt him, not the park.) Additional refinements of various kinds have developed. A distinction has been drawn between the mere condition of the premises (a child falls into a natural pond) and a dangerous situation on the premises caused by the active intervention, the affirmative acts, of the owner (the child is carelessly run down by the owner's horse and buggy). We do not propose to exhaust the catalog of refinements or the validity of the distinctions made because the real basis for liability has now emerged and has been stated with clarity by many courts. It is this: The community has an interest in the life of a child. The preservation of that life is a proper factor to be weighed against a landowner's right to the exclusive possession of his land and the use he makes of it. Conduct which unreasonably jeopardizes that life is offensive to our society and the fact that the child is a tres-

passer is only one of the elements to be weighed by the jury in its historic scales.

The principle has been stated with great clarity by many thoughtful courts and by the eminent scholars and lawyers comprising the council of the American Law Institute (2 Restatement, Torts, §§ 333–339). Thus the court of appeals of New York in *Mayer* v. *Temple Properties,* 307 NY 559 (122 NE 2d 909), had occasion recently to consider an award of damages for the death of a boy who, it was defended, was a mere trespasser. The court, in affirming the award, held, in part, as follows (pp 561, 563, 565):

"Ample evidence was adduced from several witnesses that children frequently crawled under the gates and played on the platform; that on one occasion boys threw ash cans from the platform; that defendants' agents knew of the practice of children entering upon the passageway both inside and outside of the gated portion, and on occasions chased them, notwithstanding which the clearance between the bottoms of the gates and the concrete pavement, varying according to the evidence from 8-1/2 inches to 12 inches, remained undisturbed. * * *

"The primary contention of defendants is that decedent was a trespasser *sui juris* to whom they are not liable for negligence. Plaintiff is entitled to every favorable inference which may be had from the evidence, and in that view the referee could find that he was at least a bare licensee. Whether we regard him thus or technically as a trespasser, it does not necessarily follow therefrom that defendants are not liable in negligence. * * *

"In the state of this record, we must assume that defendants had knowledge of the 'common occurrence' of children in this congested neighborhood adjoining a public school, crawling under the gates to play, to retrieve a ball or to linger awhile, and that this practice had been followed for a long time.

Despite such knowledge, the only space affording entry, through the clearance beneath the gates, was left open. Once within the gates, the platform was easily accessible to children. Under these circumstances, to cover a hole, more than half as deep as the gated passageway, with 'flimsy' pieces of wood that quickly crumbled under the feet of the infant decedent, plunging him to his death in the boiler room far below, constitutes an affirmative creation of a situation pregnant with the greatest danger to life or limb, and a deceptive trap to the unwary, as perilous as an explosive bomb, highly inflammable material, a spring gun, or kindred devices. The bringing about of an inherently hazardous situation, as we had in this case, is tantamount to a reckless disregard of the safety of human life equivalent to willfulness, and an utter heedlessness of care commensurate with the risk involved, the consequences of which may well have been anticipated."

Likewise the supreme court of Florida, in *Cockerham v. R. E. Vaughan, Inc.* (Fla 1955), 82 So2d 890, 891, quoting *Carter v. Livesay Window Co., Inc.* (Fla 1954), 73 So2d 411, 413, 414, held:

" 'Whether the deceased child was a trespasser upon the premises in question is not material. * * * The test to be applied in a case of this type is whether a reasonably prudent person should have anticipated the presence of children or other persons at the place where the appellee created a condition that a jury could find was an "inherently dangerous condition" or a "dangerous instrumentality" like unto an explosive substance, an inflammable material, a live wire or a spring gun.' Moreover, we observed in that case, 'The job was in a residential neighborhood where, as urged by the appellant, there were families with children. In addition to being so close akin to the attractive nusiance doctrine, it is common knowledge that children are as prone to play around houses

under construction as monkeys are prone to climb trees.' "

Similarly the North Carolina court, in *Ford* v. *Blythe Brothers Company,* 242 NC 347, 352–354 (87 SE2d 879):

"The evidence clearly establishes the fact that the defendant knew that its clearing and excavating operation was attracting children in large numbers to the premises under its control; that its agents and servants knew of the frequent presence of children on the premises and on several occasions requested them to leave. The defendant's evidence also reveals that the children always left when requested to do so, but would return as soon as the person making the request left.  \*  \*  \*

"The principle is well stated in 21 Am & Eng Ency (2d ed), p 473, and was cited with approval in *McGhee's Case, supra (McGhee* v. *Norfolk & Southern R. Co.,* 147 NC 142 [60 SE 912, 24 LRA NS 119]). 'A party's liability to trespassers depends upon the former's contemplation of the likelihood of their presence on the premises and the probability of injuries from contact with conditions existing thereon.' Immediately following this language the editor says: 'The doctrine that the owner of premises may be liable in negligence to trespassers whose presence on the premises was either known or might reasonably have been anticipated is well applied in the rule of numerous cases, that one who maintains dangerous implements or appliances on uninclosed premises of a nature likely to attract children in play, or permits dangerous conditions to exist thereon is liable to a child who is so injured, though a trespasser at the time when the injuries are received; and, with stronger reason, when the presence of a child trespasser is actually known to a party or when such presence would have been known had reasonable care been exercised.' "

See, also, *Davies* v. *Land O'Lakes Racing Association,* 244 Minn 248, 253, 254 (69 NW2d 642), wherein it was held:

"It was made clear in the *Gimmestad Case* (*Gimmestad* v. *Rose Brothers Company, Inc.,* 194 Minn 531 [261 NW 194]) that this court had then reached the point where the phrase 'attractive nuisance' indicated no special departure or exception from the ordinary run of negligence cases; that it had theretofore been but a convenient phrase to designate one type of case within the ordinary rule that one is liable for injury resulting to another from failure to exercise, for the protection of the injured child, the care due and commensurate with and therefore demanded by the circumstances—the greater the hazard the greater the care required;—and that nothing more is needed to support the proposition that one who maintains an artificial condition is liable for resulting injury to young children trespassing thereon if the possessor of land comes within the conditions of 2 Restatement, Torts, § 339. This court then said (194 Minn 531, 537, 261 NW 194, 196):

" 'We conclude that the idea of invitation, express or implied, actual or factual, as condition precedent to liability in the case of young children injured as was the plaintiff here, should be finally and emphatically discarded. They are trespassers, but, because of their tender years and the consequent lack of perception and responsibility, liability results notwithstanding the trespass.' "

These citations could be amplified manyfold. They are all expressive of the overriding and incontestable principle that the right of a child to life, and life unmaimed, outweighs the landowner's right to the exclusive possession of his property. That is to say, the fact that the child is a trespasser does not now relieve the owner of the duty to use reasonable care, and the scope of the liability imposed where

children are apt to trespass is to be measured by the magnitude of the danger to the child.

We have mentioned, but we have not emphasized, the distinction between an injury arising from a condition of the premises and one arising from affirmative dangerous conduct by the owner. While many cases are clear, there are many others so ambiguous as to make any attempt at hard and fast categories both futile and provocative of endless litigation. Thus a landowner removes an artificial barrier to a natural danger. Does a resultant injury to a trespassing child arise from the condition of the premises, or from the active intervention of the owner? The general concept of negligence is sufficiently broad to cover either case, in fact to be applicable to the infinite varieties of situations that may arise. In the interests of accuracy, it should be pointed out that the case before us does not involve injury from the mere physical condition of the premises, whether natural or artificial, and hence many of the cases cited by the city against recovery (*e.g.*, *Hargreaves* v. *Deacon,* 25 Mich 1; *Graves* v. *Dachille,* 328 Mich 69) are not precedent for the situation before us. Here we have injury from dangerous activities conducted in a limited area which trespassers in general are known to frequent. In this situation 2 Restatement, Torts, § 334, well states the preferable and modern principle of law, with which we are impelled to agree:

"A possessor of land who knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area thereof, is subject to liability for bodily harm there caused to them by his failure to carry on an activity involving a risk of death or serious bodily harm with reasonable care for their safety."

With respect to the city's posting of signs, and its alleged evictions of trespassing children from the premises, the following comment upon the above section is enlightening (pp 906, 907):

"Thus, it is not enough that the possessor has posted notices to the effect that 'trespass is not permitted,' or that 'trespassers will be prosecuted,' if he knows or has reason to know that such notices are disregarded either as a matter of general custom or at the particular place. If the steps taken by the possessor, no matter how reasonable when taken, prove to his knowledge ineffective, he is required to take into account the probable presence of trespassers within such area and to conduct his activities with reasonable regard for their safety."

The criterion for the imposition of liability in this situation, then, is the probability of presence, and if this is not actually reduced by the owner's signs, or other efforts, it must be taken into account in judging the reasonableness of his conduct.

The plaintiff, in addition, makes one final point, which, in itself, is conclusive as to result. We have seen that defendant Powers and the defendant city were joined in contractual relations as a result of which they split the profits from the "concessions" conducted by Powers on the land of the city. Their legal relationship was thus that of joint adventurers. *Keiswetter* v. *Rubenstein,* 235 Mich 36 (48 ALR 1049). We have also seen that defendant Powers hired various assistants to aid him in conducting his joint adventure, among them defendant Dalrymple at the Redford golf course, and defendant Jawar at the Rouge golf course. Both of these employees were in the foursome that drove into the boys near the fairway. Defendant Dalrymple, in fact, the golf professional and Powers' assistant on this course, testified that he personally observed the group of boys in the fairway before any drives were

made from the thirteenth tee. "When I approached the thirteenth tee and was ready to tee off, these youngsters were right in the middle of the fairway." And, later, "the boys started to scatter, and this young Billy Lyshak was unfortunate enough not to get out of the way and he got it." Upon these facts, infant plaintiff, even if a trespasser, was a known trespasser. It was not merely to be anticipated that he *might* be there, along with other children. He was there, he was seen, his presence was actually known to the golf professional assigned to the course, Dalrymple, and what Dalrymple knew as to golf course activities, both of his joint principals knew. Under these circumstances the rule of *Herrick* v. *Wixom,* 121 Mich 384, 388 (6 Am Neg Rep 576), is applicable:

"Where a trespasser is discovered upon the premises by the owner or occupant, he is not beyond the pale of the law, and any negligence resulting in injury will render the person guilty of negligence liable to respond in damages."

The case is remanded to the trial court with directions to set aside the judgment in defendants' favor, entered on the motion *non obstante veredicto,* and to enter a judgment in accordance with the verdict of the jury. Plaintiff may have costs.

BLACK and VOELKER, JJ., concurred with SMITH, J.

DETHMERS, C. J. (*concurring*). I concur in reversal for the last reason stated in Mr. Justice SMITH's opinion. Defendant Dalrymple, a member of the golf "foursome," saw the infant plaintiff and the other small children directly ahead in the middle of the fairway. Even after the children had moved somewhat following his claimed warning, he knew they were still in a place of possible danger when he drove a golf ball in their direction and when he

watched defendant Hayman, another member of the foursome, strike and send into the direction of these children the ball which hit plaintiff. Dalrymple was an employee of Powers in the golf course operation. Notice to Dalrymple was notice to his employer, Powers. *Robbins* v. *Magoon & Kimball Co.,* 186 Mich 672. Under the doctrine of *respondeat superior* the negligence of Dalrymple, if any, and his liability for resultant damage is chargeable to his employer, Powers. *Stewart* v. *Napuche,* 334 Mich 76. Under the holding in *Keiswetter* v. *Rubenstein,* 235 Mich 36 (48 ALR 1049), defendant city was engaged in a joint enterprise with Powers in operating the golf course and, thus, his negligence and that of his employee in furtherance of the joint enterprise is is imputed to defendant city. In considering the duty of a landowner to persons thereon with respect to avoiding injury to them through active negligence, we quoted in *Polston* v. *S. S. Kresge Company,* 324 Mich 575, 580, from *Schmidt* v. *Michigan Coal & Mining Co.,* 159 Mich 308, 311, 312, the following:

"After the owner of premises is aware of the presence of a trespasser or licensee, or if in the exercise of ordinary care he should know of their presence, he is bound to use ordinary care to prevent injury to them arising from *active negligence.*"

In *Herrick* v. *Wixom,* 121 Mich 384, 388 (6 Am Neg Rep 576), we said:

"Where a trespasser is discovered upon the premises by the owner or occupant, he is not beyond the pale of the law, and any negligence resulting in injury will render the person guilty of negligence liable to respond in damages."

It is to be noted that in *Herrick, Polston,* and *Schmidt,* as here, the claim of active negligence was involved.

As for the question of negligence, I do not wish to be understood to say that such question is invariably presented whenever one drives a golf ball on a golf course in the direction of others who are ahead, particularly if they are adults. As was said, however, in *Edgerton* v. *Lynch*, 255 Mich 456, 460:

"The courts have properly held drivers to a stricter degree of care when they see children on the road than when they see adults. *Silberstein* v. *Showell, Fryer & Co.,* 267 Pa 298 (109 A 701); *Ratcliffe* v. *McDonald's Administrator,* 123 Va 781 (97 SE 307); *Jacoby* v. *Gallaher,* 10 La App 42 (120 So 888)."

And in *Powers* v. *Harlow,* 53 Mich 507, 515 (51 Am Rep 154), this Court said:

"Children, wherever they go, must be expected to act upon childish instincts and impulses; and others who are chargeable with a duty of care and caution towards them must calculate upon this, and take precautions accordingly."

Here defendants knew of the presence of small children within the range of a flying golf ball before the foursome. Whether, under such circumstances, it was negligence to drive or permit the driving of a ball in the direction of such small children presented, as I think, a question of fact for the jury.

I concur in reversing and remanding for entry of judgment on verdict of the jury.

Carr and Kelly, JJ., concurred with Dethmers, C. J.

Edwards, J. (*concurring*). This case concerns a child of tender years—obviously too young to look out for himself. His presence in a place of potential danger, beside a golf course fairway, was known to agents of defendant who were on the tee at the time the golf ball was driven, which caused the loss of the

boy's eye. The defendant had a rule against children being on the golf course. At least on this occasion no attempt was made to enforce it. A jury found on these facts that the defendant, city of Detroit, was guilty of negligence.

We are asked to approve setting this award aside because the child was legally a trespasser and, hence, defendant owed him *no duty*.

I agree with Justice Smith and the Chief Justice that children are far too valuable to society for us to hold that trespass cancels any legal duty otherwise owed him by a landowner (or his agent) who knows, or should know, of his danger. See 2 Restatement, Torts, §§ 333–339. Although there is, as has been pointed out, a valid legal distinction in the fact that defendant here might be found guilty of active negligence, the clear purport of this case, in my eyes, is to overrule a long line of cases starting with *Hargreaves* v. *Deacon*, 25 Mich 1, and ending with *Morris* v. *Lewis Manufacturing Company,* 331 Mich 252 (28 ALR2d 214), where Michigan has barred recovery for injuries involving infant trespass—holding the effect of child trespass to be identical with that of adult trespass.

I concur in reversal and remand for entry of the jury award.

Kavanagh, J., took no part in the decision of this case.